**NEAL & COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 657–85C.

United States Claims Court.

Feb. 9, 1990.

---

464

R.R. De Young, Anchorage, Alaska, for plaintiff.

Frank B. Flink, Jr., Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

The two claims tried in this case are part of a series of disputes between a government contractor and the United States Naval Facilities Engineering Command, Western Division (WestDiv) stemming from construction projects at the United States Navy base at Adak, Alaska. The other claims already have been resolved. Plaintiff successfully bid on a contract to manufacture and erect two fuel storage tanks at the Defense Fuel Support Point in the Aleutians, and entered into a lump sum, fixed-price contract with the Navy. The contract has been performed, the project has been completed, and plaintiff now seeks an equitable adjustment on its two claims, following denials by the contracting officer.

In light of the evidence presented at trial, and after careful consideration of the parties post-trial submissions, the court finds that plaintiff is entitled to recover on both claims under the Contract Disputes Act of 1978 (now codified at 41 U.S.C. §§ 601–611 (1982)). Because each claim presents different factual and legal issues, the claims are discussed separately.[1]

## I. WARPED PANEL CLAIM
### BACKGROUND

As part of the contract to construct the two storage tanks which are the subject of this dispute, plaintiff was required to manufacture, transport to Adak, and install 96 concrete and steel wall panels. Generally, each was to be 20 feet 6 inches tall, 8 feet 9 inches wide, and 8 inches thick, with a ¼ inch steel plate attached to one side, forming a liner in the constructed tanks. These panels weighed about 21,000 pounds. Because of the climate and remoteness of the project's ultimate destination, the government's design called for the concrete to be cast and the steel plate attached prior to shipment to Adak.

To perform this aspect of the contract, plaintiff subcontracted with Concrete Technology Corporation (CTC), a manufacturer specializing in the production of precast, prestressed concrete products, which was responsible for manufacturing, loading, and shipping the panels, as well as for supervising the on-site post-tensioning of the tanks.[2] The design of the panels did not contemplate any bonding between the concrete and the steel liner. During the curing period, however, it was discovered that the concrete did bond to the steel and that the wall panels were bowing to a greater degree than had been expected, i.e., they had an unanticipated curvature from end to end. Neal notified the Navy of the bowing as soon as it was discovered.

CTC perceived that the bowing created the potential for great difficulties in the erection of the panels, and, in cooperation with the designer, performed calculations to determine if the stress caused by the bonding was acceptable. Thereafter, CTC, the designer, and Neal's quality control representative determined that the panels would be measured and a solution would be found to prevent the need for rejecting the panels. The Navy was advised that CTC

1. The court adopts many of plaintiff's statements of the facts as set forth in plaintiff's post-trial submissions.

2. From testimony introduced at trial, it appears that CTC was involved with the Navy and the Navy's design firm, Tryck, Nyman & Hayes,

prior to contracting with Neal, and probably had some input into the specifications that became part of the IFB. To the extent that CTC participated in creating the flawed design specifications, it did so outside of its employment as plaintiff's subcontractor.

would be taking actions to minimize the impact of the bowing, and suggested that the designer check the bowing again at Adak to determine whether there had been any change from the time they left CTC's operation in Tacoma, Washington.

CTC's plan for minimizing the harm created by the bowing essentially involved giving each panel a unique number, to permit sequencing the bowed panels in a precise erection order, so that panels with similar bowing were erected next to one another. This would serve to minimize the relative bowing of the panels. This plan also required additional work in loading the panels on the barge according to a panel erection schedule, and off-loading them in such a way as to ensure that they did not become out of sequence. At that time, plaintiff notified the Navy that if the cause of the additional bowing was a design problem, it would request compensation for its additional time and expense. Although plaintiff requested the Navy to investigate the cause of the bowing, the Navy accepted its designer's representation that the cause of the problem was not in the design and that the plan proposed by CTC would ameliorate the problem.

Neal adopted its subcontractor's plan, without protest from the Navy, and additionally engaged CTC's precast concrete wall specialist, William Allyn, to supervise the off-loading and erection of the panels. Although Mr. Allyn did go to Adak, he returned to Tacoma before all adjustments to the panel alignment were made. Plaintiff was charged $5,782.35 for Mr. Allyn's expenses and services in Adak.

On August 31, 1984 plaintiff submitted a claim to defendant for costs of $17,486.71 for the specialist's services on the basis that the bowing was a design problem and that the services of a specialist familiar with the design would mitigate any other extra costs incurred at the job site due to the bowing. Defendant disallowed the submitted costs on the basis that an erection schedule had been prearranged and the panels marked accordingly, obviating the need for additional work at the site. Neal requested the Navy reconsider its request, and asked for a contract modification in the amount of $7,863.96, which included room and board and mark-up for Mr. Allyn's activities. Five months later, plaintiff received a letter from the Navy advising it that insufficient evidence had been presented to warrant a contract modification.

On March 21, 1985, plaintiff submitted a certified claim for actual costs and mark-up associated with the bowing, and for a time extension of three days for handling and erecting the bowed panels. The claim was referred to the contracting officer on December 26, 1985, and on March 21, 1986 plaintiff's claim was denied on the basis that Neal had failed to substantiate its contention that the bowing was due to a design deficiency. Further, in light of the contract and the industry's typical tolerance limits, the actual measurements did not support Neal's allegation of a design error. Plaintiff then filed this action.

## DISCUSSION

Plaintiff claims that the additional bowing was caused by a flaw in the government's design specifications, and that defendant therefore must bear the resultant costs. The law is clear that the government warrants design specifications. It has been stated by our predecessor court:

> where the government orders a structure to be built, and in so doing prepares the project's specifications prescribing the character, dimension, and location of the construction work, the government implicitly warrants, nothing else appearing, that if the specifications are complied with, satisfactory performance will result.

*J.D. Hedin Constr. Co. v. United States,* 347 F.2d 235, 171 Ct.Cl. 70, 76–77 (1965) (quoted in *J.L. Simmons Co. v. United States,* 412 F.2d 1360, 188 Ct.Cl. 684 (1969) (relying on *United States v. Spearin,* 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918))) (citations omitted). Thus, if this court finds the cause to be a deficiency in a design specification the government would bear the risk, and consequently be liable

for reasonable costs incurred by the plaintiff.

In the event the court finds that a flaw in a design specification caused the unanticipated bowing, the defendant's position is that the bowing was within acceptable tolerance levels and, in any event, should have been foreseen by plaintiff, and that any additional costs incurred by plaintiff were unnecessary. In keeping with this analysis, the court must first establish whether the additional bowing was the result of a design or performance specification; only if the cause was a deficiency in a design specification will the court inquire into the reasonableness of plaintiff's actions and the measure of damages, if any.

### Design or Performance Specification

■ The Court of Appeals for the Federal Circuit has stated that "Design specifications explicitly state how the contract is to be performed and permit no deviations. Performance specifications, on the other hand, specify the results to be obtained, and leave it to the contractor to determine how to achieve those results." *Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1582 (Fed.Cir.1987). Moreover, the inclusion of language requiring the completed project or assembly to pass certain performance tests or standards does not convert a design specification into one of performance. *See, e.g., R.E.D.M. Corporation v. United States,* 428 F.2d 1304, 192 Ct.Cl. 891, 901 (1970).

In the instant case, the pertinent sections of the IFB, as well as the contract as a whole, contained both design and performance specifications. In particular, section 03420, entitled, "Precast, Prestressed Concrete," consisted of nine pages of mixed specifications, a sampling of which are as follows:

2.1.7 Sheathing: Shall be strong enough to retain its shape under the weight of concrete and resist unrepairable damage during construction.... Provide drain holes if the tendon is to be placed, stressed and grouted in freezing climate.

3.1.5 Placing Sheathing: Place sheathing to form ducts for post-tensioning tendons. Fasten sheathing securely at close enough intervals to avoid displacement during concreting.... After placing of sheathing, reinforcement and forming is complete, perform an inspection to locate possible sheathing damage. Repair all holes or openings in the sheathing prior to concreting.

3.1.13.2 Strands for precast-prestressed members shall be given an initial stress equal to approximately 10 percent of the design load, after which the alignment shall be checked for conformity to the drawings....

It should be noted that the above excerpts were randomly chosen to illustrate the nature of the specifications. Overall, they were highly detailed, notwithstanding references to tolerances and standards to which the product was required to comply. This is far more detailed and specific than the performance specification defined by the Federal Circuit in *Stuyvesant Dredging,* and is, in this court's opinion, clearly a design specification.

### Cause of the Bowing

Because of the complex nature of this construction project, it is difficult to determine which single or few specifications caused the bowing. There appears to be no reasonable dispute, however, that, in retrospect, the use of a bond-breaker, a layer of oil placed between the concrete and the steel, would have reduced the likelihood of the bowing. In addition to the testimonial and documentary evidence of this causal connection, it is worth noting that the specifications for a third tank constructed after the completion of this project required the use of a bond-breaker. With respect to the instant contract, this subject appears to be covered in specification 3.1.2:

Forms: Forms shall be well braced and stiffened against deformation, and shall be accurately constructed. The forms shall be such as to produce a smooth dense surface. A bond-breaking substance may be applied to the forms before pretensioning steel is placed; if so,

it should be done in accordance with PCI MNL–116. Form ties shall be either the threaded or snap-off type, so that no form wires or metal pieces will be within 1½ inches of the surface.

■ Defendant's argument that the option given to the contractor to use a bondbreaker transfer the risk to plaintiff is not at all compelling. Rather, when the government provides alternate methods by which a project may be completed there is an implied warranty that either method will achieve the desired result. *See, e.g., S. & M–Traylor Bros.*, ENGBCA 3852, 78–2 BCA ¶ 13,495 (1978); *Southern Paving Corp.*, AGBCA 74–103, 77–2 BCA ¶ 12,813 (1977). Similarly, defendant's argument that the fact that 80 out of 90 panels did not have excess camber indicates the cause was not a design specification is not compelling. As the Court of Claims has stated, the fact that specifications "yield some acceptable finished articles clearly does not mean that they may not be deemed defective for purposes of the author's liability to the user." *R.E.D.M. Corporation*, 428 F.2d 1304, 192 Ct.Cl. at 899 (where failure occurred in 20% of fuzes constructed according to specification).

■ Finally, the court is not persuaded that the contractor's use of a higher strength concrete than that contemplated by the contract was the cause of the additional bowing. Certainly, it was not the factor on which all parties involved focused at the time the efforts were undertaken to identify and correct the problem. The testimony provided virtually no support for this governmental contention.

■ Having determined that the present claim was the result of a flaw in a design specification, the court must address the extent to which defendant should be held liable. It should be stressed that the design defect was not a major one. Also, the problem created by the bowing was not very large, and the damages claimed, in light of the whole contract, are also not very large.

### Reasonableness of Plaintiff's Efforts

■ Defendant argues that the bowing of nearly all of the panels was within acceptable tolerance levels, and that plaintiff's reaction to the additional bowing was unreasonable. The court finds that defendant improperly has adopted a position of 20/20 hindsight. Fortunately for all involved, the bowing was not as dramatic as could have been anticipated at the time it was first discovered, and the problems created by the bowing that did occur were minimized by the contractor's and subcontractor's efforts. The defendant has offered much post hoc testimony and evidence on the lack of actual effect by the bowing on the construction, but the defendant's emphasis is misplaced. All that can be asked of a contractor in plaintiff's position is that it take the steps a reasonable contractor would have taken at the time the potential harm was discovered. In this case, at the time the bowing was discovered, all parties were concerned and actively investigating the possible causes and solutions to prevent what could have been a much larger problem. The methods employed by plaintiff were reasonable and efficacious. In fact, defendant repeatedly has stated that the tanks were well-constructed and perform satisfactorily. This provides some perspective to the reasonableness of plaintiff's approach.

### Damages

Having found that the bowing was caused by a flaw in a design specification, and that plaintiff's response to the problem was a reasonable one, the court must determine the damages to which plaintiff is entitled. This detailed inquiry centers on distinguishing tasks plaintiff was obligated to perform under the contract itself from those necessitated by the unanticipated bowing.

■ As discussed above, most of the expenses incurred by plaintiff as a result of the design flaw were associated with the decision to sequence the panels in such a way as to minimize the effect of the bowing. This involved numbering the panels and loading, unloading, and erecting them

in accordance with a detailed plan, and required far more precision throughout the process than that contemplated in the IFB. Although defendant is correct that some sequencing of the panels would have been necessary in any event, the court is convinced that additional time and money was expended as a direct result of the unanticipated bowing, and it is for that amount plaintiff may recover.

■ Contrary to defendant's contention, plaintiff need only prove the quantum of its claim by a preponderance of the evidence. *See, e.g., Teledyne McCormick-Selph v. United States,* 588 F.2d 808, 218 Ct.Cl. 513 (1978). For the most part, plaintiff in this case has met its burden of proof. This court and the Court of Claims have recognized that the defendant bears a substantial burden of proving that the costs claimed for an equitable adjustment are not reasonable. *See, e.g., Bruce Construction Corp. v. United States,* 324 F.2d 516, 163 Ct.Cl. 97 (1963); *North Slope Technical, Ltd. v. United States,* 14 Cl.Ct. 242 (1988). Defendant has failed to do so.

■ The court adopts plaintiff's detailed estimates which were based on a man hour basis, using wage and equipment rates routinely paid while performing this project. Defendant has argued that a total cost approach is frowned upon in the jurisprudence of this court, its predecessor, and the Court of Appeals for the Federal Circuit, and that well may be the case. It is irrelevant here, however, where plaintiff is not employing a total cost method. Admittedly, the method used is not ideal; certainly, if actual invoices were available to cover the claimed extra costs, the court could base its findings on them. Given the nature of this particular project, however, it would have been grossly unfair to require plaintiff to have kept separate invoices for work attributable to this claim.

■ Plaintiff failed to meet its burden of proof with respect to one category of claims, namely the one labelled "Additional time handling and erecting panels in proper sequence." The sum associated with this aspect consists of $12,209.40 for labor, social security and unemployment insurance, $4,686.00 for equipment and materials, $1,942.97 for field overhead (at 11.5%), $1,789.65 for home office overhead (at 9.5%), $1,237.68 for profit (at 6%), and $81.18 for prime contractor's bond premium (at 0.37%), for a total disallowance of $21,946.88. In light of the court's finding that plaintiff is entitled to all other costs claimed, the amount disallowed will be deducted from the $95,142.00 sought. Thus, plaintiff is entitled to recover $73,195.12 on this claim.

## II. STEEL SHIPMENT CLAIM

### BACKGROUND

The essence of this claim is that the contract permitted Neal to ship certain materials at the Navy's expense and that the contracting officer therefore was in error in authorizing the Navy to issue a unilateral deductive modification to the contract on June 28, 1985.[3] The dispute turns on the language of Amendment 002 to the IFB, and, more specifically, on paragraph 21.1 of Section 01011:

Transportation: The Government will ship from Seattle, Washington, to the U.S. Naval Station, Adak, Alaska, such Contractor-owned construction materials as may be required for use under this contract, except *precast concrete elements and steel tank liner,* at no expense to the Contractor.... The Contractor is responsible for scheduling, shipping and cost of transporting *precast concrete elements and steel tank liner.*

(emphasis supplied)

The plaintiff claims that under this provision it was entitled to, and did, ship on the government vessel all steel except the precast concrete panels with attached steel

---

**3.** Neal also contends that if the government was entitled to an adjustment for the cost of shipping the disputed components, the government improperly calculated the adjustment. Because the court finds that the government was in error in taking a unilateral deduction, it is not necessary for the court to determine the amount to which the government would have been entitled had it not been in error.

liner, which was shipped on CTC's specialized barge at Neal's expense. Plaintiff alleges that the IFB provision allocating responsibility for costs of shipping materials to Adak contained latent ambiguities, and that Neal's interpretation of that provision was reasonable. Accordingly, Neal argues that the Navy was in error when it made a unilateral deduction of $46,711.00 from the amount owed plaintiff under the contract.

The defendant's position is that the provision clearly and unambiguously obligated the plaintiff to ship at plaintiff's expense the separate and distinct materials of precast concrete panels with steel tank liner attached and the separate steel tank liner for other parts of the tank. Because the language was clear, the defendant argues, this court must not entertain extrinsic evidence to vary the terms of the contract.

## DISCUSSION

■ The court's analysis of this issue is guided by the decision of the Court of Claims in *Newsom v. United States*, 676 F.2d 647, 230 Ct.Cl. 301 (1982), which outlined the applicable step-by-step approach. As applied to the instant case, that approach requires the court first to determine whether the shipping requirement was ambiguous,[4] second, to determine whether the ambiguity was patent, and only if the ambiguity was not patent, to determine whether Neal's interpretation of the IFB was reasonable. If Neal's interpretation is deemed reasonable, then the rule of *contra proferentum* would operate, *id.* 676 F.2d at 650 n. 11. This is so because the defendant does not dispute that the Navy was responsible for drafting the provision in question, thus Neal would prevail on this claim.

*Whether the language was ambiguous*

■ The language in a contract may be said to be ambiguous when it is capable of more than one reasonable interpretation.

*Southern Constr. Co. v. United States*, 364 F.2d 439, 176 Ct.Cl. 1339, 1361 (1966). An ambiguous contract also has been characterized as one that is "susceptible of two different interpretations, each of which is found to be consistent with the contract's language." *Blinderman Constr. Co. v. United States*, 17 Cl.Ct. 860, 863 (1989) (citing *Sun Shipbuilding & Dry Dock Co. v. United States*, 393 F.2d 807, 183 Ct.Cl. 358, 372 (1968)). Recent decisions of the Claims Court that have applied this test have been quick to note that a disagreement among the parties as to the meaning of a term does not necessarily make the term ambiguous. *See, e.g., Merrick v. United States*, 18 Cl.Ct. 718 (1989); *Dynamics Corp. of America v. United States*, 17 Cl.Ct. 60 (1989) (relying on *Southern Constr. Co. v. United States*, 364 F.2d 439, 176 Ct.Cl. 1339, 1361 (1966)). Rather, there must be a reasonable uncertainty of meaning. *See, e.g., International Bus. Invs. v. United States*, 17 Cl.Ct. 122, 125 (1989) (relying on *ITT Arctic Servs. v. United States*, 524 F.2d 680, 207 Ct.Cl. 743, 767 (1975) and *Southern Constr. Co., supra*). *See also Blinderman*, 17 Cl.Ct. at 863.

■ In this case, the parties agree that there is a dispute as to the term "steel liner" in the context of Amendment 002. The defendant, however, contends that the term clearly included two categories of material: precast concrete panels with attached steel tank liner panels; and steel tank liner which was not attached to any concrete, such as the steel floor panels. Defendant asserts that the contention that precast concrete elements and steel tank liner are two separate entities is confirmed by the fact that plaintiff shipped other precast concrete elements to Adak which did not contain steel tank liner embedded before shipment, such as precast roof beams and hollow core roof panels, and the fact that the plaintiff shipped other steel tank

---

**4.** "[T]he plain meaning of the contract is binding upon the court unless the contract by its very terms is inherently ambiguous." *Opalack v. United States*, 5 Cl.Ct. 349, 359 (1984). If the provision is clear on its face, Neal would not be permitted to introduce extrinsic evidence to vary the shipping responsibilities. *See Beta Sys-*

*tems v. United States*, 838 F.2d 1179, 1183 (Fed. Cir.1988). If the language is unambiguous, as the Government contends, then the words "are to be given their plain and ordinary meaning." *Thanet Corp. v. United States*, 591 F.2d 629, 219 Ct.Cl. 75, 82 (1979).

liner not embedded in precast concrete, such as the steel floor panels. Moreover, defendant argues, plaintiff's interpretation would render superfluous and meaningless the word "and" as it joined "precast concrete elements" to "steel liner." Because the preferable method of construing a contract is to avoid rendering language superfluous and meaningless, *see, e.g., Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985), the defendant claims the court must reject the plaintiff's interpretation.

Plaintiff's contention is that the terms "and steel tank liner" refer only to the steel tank liner attached to the concrete panels. This is supported by the fact that the concrete attached steel was functionally different for shipping purposes than the other tank liner and by the fact that the Navy itself treated some of the unattached steel tank liner as not covered by this provision.

After carefully reviewing the evidence presented, and having observed the parties' and witnesses' testimony and demeanor, the court must conclude that the provision in question was ambiguous. Both sides presented a great deal of credible evidence supporting their respective positions, including one telling fact that the person designated by the Navy to receive pre-bid inquiries, Mr. Kim Abbot, had consulted with Lt. Mark A. Eilert, Assistant Resident Officer in Charge of Construction, to "elicit a fully independent interpretation [of the shipping requirement]." The uncertainty on the part of Navy personnel as to the meaning of "steel liner" in Amendment 002 is evident from this statement, and buttressed by other trial testimony of Navy representatives. In this light, the disputed language was more than a "disagreement among the parties," *Dynamics Corp. of America, supra.* Surely, there was at least a "reasonable uncertainty of meaning," *International Bus. Invs., supra.*

■ Having determined that the language of Amendment 002 was ambiguous, the court must now decide whether that ambiguity was patent. If so, Neal would have had a duty to seek clarification.

*Whether the ambiguity was patent*

■ As the Court of Claims stated in *WPC Enterprises, Inc. v. United States,* 323 F.2d 874, 163 Ct.Cl. 1 (1963), a patent ambiguity exists where there is "an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap." *See also Hoppmann Corp. v. United States,* 18 Cl.Ct. 220 (1989) and cases cited therein. In determining whether the ambiguity would have been obvious to a contractor prior to bidding, the court is mindful of the Court of Claims' observation that:

> [C]ontractors are businessmen, and in the business of bidding on Government contracts they are usually pressed for time and are consciously seeking to underbid a number of competitors.... They are obligated to bring to the Government's attention major discrepancies or errors which they detect in the specifications or drawings, or else fail to do so at their peril. But they are not expected to exercise clairvoyance in spotting hidden ambiguities in the bid documents,....

*Blount Brothers Constr. Co. v. United States,* 346 F.2d 962, 171 Ct.Cl. 478, 496–97 (1965).

At the heart of the inquiry is whether the contractor had a duty to seek clarification during the bidding process. What gives rise to this duty "cannot be defined generally, but on an ad hoc basis of looking to what a reasonable man would find to be patent and glaring." *Max Drill, Inc. v. United States,* 427 F.2d 1233, 192 Ct.Cl. 608, 626 (1970).

In the instant case, neither party has actively assisted the court in making this ad hoc determination. Rather, defendant has merely asserted that if there was any ambiguity, it was patent. Ample evidence has been presented throughout the course of this litigation, however, to convince the court that the disputed shipping requirements were not patently ambiguous; rather, in light of the complexity of the project and the detail of the IFB, the ambiguity was a subtle one. For these reasons, the court finds that the ambiguity was latent,

and that the plaintiff was under no duty to seek clarification. Having so found, the court must address the reasonableness of the plaintiff's interpretation. *Newsom*, 676 F.2d 647, 230 Ct.Cl. at 304.

### Whether plaintiff's interpretation was reasonable

Plaintiff is not required to have construed the ambiguous provision in a more reasonable manner than did defendant. Rather, if "the contractor follows an interpretation that is reasonable, this interpretation will prevail over one advanced by the Government, even though the Government's interpretation may be a more reasonable one since the Government drafted the contract." *United Pacific Ins. Co. v. United States*, 497 F.2d 1402, 204 Ct.Cl. 686 (1974).

To determine whether plaintiff's interpretation was reasonable, the court must put itself in the place of a reasonable and prudent contractor. *Shank–Artukovich v. United States*, 13 Cl.Ct. 346, 350 (1987), *aff'd mem.*, 848 F.2d 1245 (Fed.Cir. 1988) (relying on *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913 (Fed.Cir.1984)). The defendant contends that Neal's interpretation was not reasonable because it renders meaningless and superfluous the words "and steel tank liner." Because well-established rules of contract interpretation require that all parts of a contract be harmonized and that the contract be interpreted so that no provision is rendered meaningless, the defendant argues that Neal's interpretation must fail. The defendant's argument is flawed for two practical reasons.

First, the project called for two types of steel tank liner with different characteristics. In some instances, steel tank liner referred to the steel attached to the concrete wall panels. In other cases, for example, it referred to the roof and floor liners. Secondly, the contract did call for some steel liner to be shipped at the contractor's expense and other to be shipped at the Navy's direct expense. The combination of these two factors leads to the conclusion that all provisions of the contract could not be harmonized, and that further interpretation is required.

In addition, defendant is unable to explain why the specific disputed language was added. It will be recalled that the original IFB called for the Navy to ship all material, and that the disputed language was included in Amendment 002. The defendant offered testimony that the large size and heavy weight of the material required the use of a barge, and that this might have been the Navy's reason for shifting the responsibility for some of the shipping to the contractor. Mr. Abbott testified that at the time of the Neal contract, the government had a contract with Sea/Land Services, Inc. to provide services to Adak, but that did not include barge service. Defendant also contended, somewhat inconsistently, that the decision to have Neal ship the material probably was to provide Neal with needed flexibility. This buttresses the reasonableness of plaintiff's distinction between the steel attached to the very large and heavy concrete panels and all the other steel.

At the same time, it was admitted by defendant that Amendment 002's genesis was an inquiry made by Aleutian Constructors, a competing contractor with a great deal of equipment on Adak at the time. Aleutian's inquiry, which was more in the nature of an informal protest, indicated their concern that the original IFB would have permitted a contractor's equipment to be shipped at government expense. Since Aleutian was the only contractor on the island, this provision would have taken away its competitive advantage. Although the Navy never communicated this to Neal or other bidders, it appears that if there was any identifiable purpose to the amendment it was to require contractors to bear the cost of shipping their construction equipment, such as tractors and cranes, or to rent it from Aleutian.

Finally, the court is convinced that any result other than the one reached here would yield a windfall to the government. The steel arrived at the job site and the Navy never paid to get it there, notwithstanding its expectation that it would pay

for the cost of shipping the steel, whether it paid directly under the original contract, or as part of the contractor's bid via Amendment 002. Defendant argues that under Amendment 002 the contractor should have included the cost in its bid, which the court is persuaded was not done. In most instances, the contractor should bear the liability for failing to include a cost in the development of its bid. This is not the case here, however, where the cause of the contractor's omission was a latent ambiguity in the contract. Having found that Neal did not include the price of shipping the disputed material in its bid, the court sees no merit in defendant's concern that the government will be paying twice for the same service. The court also finds that there is no genuine argument that Neal would not have been the low bidder if it had included the shipping cost, because the closest bid to Neal's bid of $7,693,000 was $7,980,000.

For the foregoing reasons, plaintiff is entitled to recover the $46,711.00 unilaterally deducted by the government.

### CONCLUSION

For the reasons stated herein, the court finds for the plaintiff as follows:

*Bowed Panel Claim:* $73,195.12 plus interest from December 26, 1985, the date on which the contracting officer received the claim, in accordance with the Contract Disputes Act, 41 U.S.C. § 611 (1982);

*Steel Shipment Claim:* $46,711.00 plus interest from October 1, 1985, the date on which the contracting officer received the claim, in accordance with the Contract Disputes Act, 41 U.S.C. § 611 (1982).

The Clerk of the Court is directed to enter judgment pursuant to this opinion.