**NEAL & COMPANY, INC., Plaintiff–Appellee,**

v.

**The UNITED STATES, Defendant–Appellant.**

**No. 90–5108.**

United States Court of Appeals, Federal Circuit.

Sept. 23, 1991.

---

David P. Gorman, Wade & DeYoung, Anchorage, Alaska, argued for plaintiff-appellee. With him on the brief were R.R. DeYoung and David M. Freeman, of counsel.

Sharon Y. Eubanks, Asst. Director, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for defendant-appellant. With her on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Thomas W. Petersen, Asst. Director and Frank B. Flink, Jr., Atty.

Before NEWMAN, MICHEL and PLAGER, Circuit Judges.

PLAGER, Circuit Judge.

Plaintiff-appellee Neal & Company, Inc. (Neal) entered into a fixed-price contract with defendant-appellant the United States (Government) to construct two fuel storage tanks at the United States Navy base at Adak, Alaska (Adak). The Government provided the specification for the manufacture of panels used in constructing the tanks. Some of the panels bowed during construction resulting in unanticipated costs to Neal. Additionally, Neal claimed that the contract required the Government to ship certain construction materials but that the Government did not, causing Neal to incur unanticipated shipping expenses. Neal submitted its claim, for both the bowed panels and shipping expenses, to the Resident Officer in Charge of Construction (ROICC) who in turn forwarded the claim to the contracting officer. The contracting officer refused to award these expenses to Neal and Neal sought recovery in the United States Claims Court. Chief Judge Smith, in a well reasoned opinion, held that the claim was properly before the court under the Contract Disputes Act and that Neal was entitled to recovery for both the bowed panel and the shipping expenses. *Neal & Co. v. United States*, 19 Cl.Ct. 463 (1990). The Government appeals; we affirm.

## BACKGROUND

On February 17, 1984, the Government awarded Neal a fixed-price contract in the amount of $7,693,000 for the construction of two fuel oil storage tanks[1] at Adak. Each tank is constructed from a series of precast concrete panels covered on one side with a one-quarter inch thick steel lining. The roof of the tank is made of hundreds of smaller precast concrete panels and has no steel lining. During construction, the walls are erected, the roof attached and then a concrete floor is poured. Steel liner in the form of plates laid on top of the concrete floor completes the lining of the tank.

Neal arranged for the tank wall panels (with steel plates attached) and the roof panels to be manufactured by a third party near Seattle, Washington. These panels were than shipped to Adak for installation.

*Bowing of the Panels.* The wall panels were manufactured to the specification provided by the Government. Unfortunately, during manufacture, unanticipated bonding occurred between the steel lining and the wall panels causing the wall panels to bow.[2] To avoid the expense of discarding the bowed panels and starting again, Neal devised a plan to measure and match the bowed panels, thus allowing their use in a tank. This procedure required that the panels be erected in a particular sequence. Neal sought recovery of the unanticipated expense associated with measuring and marking the panels as well as unloading the panels in Adak to allow their erection in the required sequence.

*Shipping.* Under the contract, some of the construction material was to be shipped by the Government at Government expense and some was to be shipped by Neal at Neal's expense. The relevant contract provision states in part:

> The Government will ship from Seattle, Washington, to the U.S. Naval Station, Adak, Alaska, such [Neal]-owned construction materials as may be required for use under this contract, except precast concrete elements and steel tank liner, at no expense to [Neal].

*Joint Appendix* at 93. Neal read this provision to require the Government to ship all construction materials except the precast concrete elements attached to steel liners. Thus, the steel floor plates, which are not attached to concrete, would be shipped by the Government. The Government read the contract to require that it ship all con-

---

1. Each tank is essentially a hollow cylinder approximately 100 feet in diameter and 20 feet tall.

2. A third tank, constructed after the completion of this contract, required the use of a bondbreaker between the concrete and the steel to prevent bonding and the subsequent bowing.

struction material except: 1) precast concrete elements; and, 2) steel tank liner.

## DISCUSSION

### A. Jurisdiction

The Government argues that under the Contract Disputes Act, 41 U.S.C. §§ 601–12 (1988), the Claims Court lacked jurisdiction to rule on Neal's claim. The Claims Court has jurisdiction over "any claim by or against, or dispute with, a contractor arising under [41 U.S.C. § 609(a)(1) ]." 28 U.S.C. § 1491(a)(2) (1988). Section 609(a)(1) provides that a contractor may appeal to the Claims Court a decision of a contracting officer under section 605. Section 605(a) requires that:

All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision.

The Government argues that Neal failed to submit its claim to the contracting officer and that *West Coast Gen. Corp. v. United States*, 19 Cl.Ct. 98, 100–01 (1989) holds that a submission to other than the contracting officer fails to meet the requirements of section 605(a). From this, the Government concludes that the Claims Court lacked jurisdiction.

In the present case, prior to Neal's submitting its claim to the ROICC, Neal wrote the ROICC requesting a contract adjustment. The ROICC responded in a letter stating that Neal had not submitted sufficient information to warrant a contract adjustment but that Neal could

request a decision of the Contracting Officer pursuant to the provisions of the disputes clause of the contract. [Neal could also] submit additional information and ... request that the previous correspondence concerning this matter be forwarded to the Contracting Officer for further review and final determination.

*Joint Appendix* at 256. Neal submitted additional information along with a claim addressed to the ROICC. The claim included a request for "a Contracting Officer's Decision in accordance with [the contract]." *Id.* at 110.

The Claims Court, in awarding Neal monies for the bowed panel and shipping expenses, awarded interest from the time the claim reached the contracting officer, rather than from the time Neal submitted documentation to the ROICC. In effect, the court determined that the claim was submitted to the contracting officer on the date the claim was received by the contracting officer. *Neal*, 19 Cl.Ct. at 474; *see* 48 C.F.R. § 33.208 (1990).

The plain language of § 605 requires claims against the Government to be submitted to the contracting officer. It does not, however, require that the claims be sent only to the contracting officer, or necessarily directly to that officer. In enacting § 605 of the Contract Disputes Act, Congress described the flexible role of the contracting officer:

While the objective may be to make the contracting officer the focal point for decisions, practicability dictates that the extent to which the contracting officer relies on his own judgment or abides by the advice or determination of others is dependent on a variety of factors, including ... the nature of the particular procurement.... [I]t is impossible to generalize as to what the contracting officer's role should be in all situations....

Thus, in the disputes and remedies area, the procuring agencies should have flexibility in deciding what role the contracting officer will have.... [I]f for one reason or another, the contracting officer is not the primary decisionmaker on a contract matter, the Government must tell the contractor this, and tell the contractor who is making the decision.

S.Rep. No. 1118, 95th Cong., 2d Sess. 1, at 21–22, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5235, 5255–56.

■ In this case, the ROICC was Neal's primary contact with the Government. If, as in this case, the contractor sends a proper claim to its primary contact with a request for a final decision of *the contracting officer* and a reasonable expectation that such a request will be honored, and the primary contact in fact timely delivers the claim to the contracting officer, then

we see no basis for finding that the claim was not submitted to the contracting officer as required under § 605(a).[3] We agree with the analysis of this issue set forth in the recent decision of a panel of this court in *Dawco Constr. v. United States*, 930 F.2d 872, 879–80 (Fed.Cir.1991). *See also Robin Indus., Tadcol Gov't. Serv. Div. v. United States*, 22 Cl.Ct. 448, 455 (1991); *American Pac. Roofing Co. v. United States*, 21 Cl.Ct. 265 (1990); *but see West Coast Gen.*, 19 Cl.Ct. at 100–01. Because a proper claim was timely submitted to the contracting officer, the Claims Court had jurisdiction to decide the matter and we, therefore, address the merits of this appeal. 28 U.S.C. § 1295(a)(3) (1988).

## B. Bowing of the Panels

■ The Claims Court examined the Government-supplied specification and determined that it was a design, rather than a performance, specification. *Neal*, 19 Cl.Ct. at 468.[4] The Claims Court also determined that the bowing resulted from a flaw in the design specification, i.e., the Government's failure to specify the use of a bond-breaker during manufacture. *Neal*, 19 Cl.Ct. at 468. The Government does not dispute these determinations.

■ The Government does dispute the award of damages to Neal, and argues that no additional effort was required to measure, mark and sequence the panels to account for the bowing because the contract already required some degree of sequencing. *Joint Appendix* at 50. In reaching its decision, the Claims Court examined evidence, including the contract, heard testimony, and concluded that the sequencing process utilized to minimize the impact of the bowing "required far more precision throughout the process than that contemplated [at the time of contracting]." *Neal*,

19 Cl.Ct. at 470. The Government has not shown this finding to be clearly erroneous.

■ As to determining the costs associated with the special treatment engendered by the bowed panels, we agree with the Claims Court that it would have been "grossly unfair" to require Neal to keep one set of cost records for work originally contemplated under the contract and another set of records for the additional work. The Government has not shown that the Claims Court's determination that use of this quasi-total cost method to determine damages was inappropriate or that Neal did not meet its burden of proof in establishing these additional costs.

We affirm the award of the Claims Court for the bowed panel claim.

## C. Shipping

■ The contract stated that the Government was not required to ship "precast concrete elements and steel tank liner." In reading the contract, Neal concluded that the phrase "precast concrete elements and steel tank liner" referred only to those precast concrete elements attached to steel tank liner and that all other construction material would be shipped by the Government. The Government, however, concluded that it was not obligated to ship precast concrete elements (regardless of whether or not they were attached to steel tank liner) or steel tank liner (regardless of whether or not it was attached to concrete elements), and denied Neal's claim.

In determining what material the Government had contracted to ship and what material Neal was required to ship, the Claims Court found a latent ambiguity in the language of the contract. Because, *inter alia*, the contract was written by the Government, the ambiguity was latent, and

---

**3.** Of course, such a multi-step delivery process risks delay in the submission of the claim, which may have other legal consequences. It is not unreasonable to find, as Chief Judge Smith did here, that the official date of receipt of the claim for purposes of determining entitlement to interest is the date it is delivered to the contracting officer, and not the date it is received by other government officials.

**4.** A design specification details the materials to be used and how the work is to be performed. A performance specification "specif[ies] the results to be obtained, and leave[s] it to the contractor to determine how to achieve those results." *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed.Cir.1987) (*citing J.L. Simmons Co. v. United States*, 412 F.2d 1360, 1362, 188 Ct.Cl. 684 (1969)).

Neal's interpretation was reasonable, the Claims Court accepted Neal's interpretation of the contract under the rule of *contra proferentem* and awarded shipping costs to Neal.

On appeal, the Government argues that there was no ambiguity and that even if there was, Neal's interpretation would make the term "steel tank liner" a nullity. We disagree. The contract dealt with steel liner and plate, with precast concrete without steel liner attached, and with precast concrete with steel liner attached. Interpretation of the term "precast concrete elements and steel tank liner" to mean "concrete with liner attached" rather than "all concrete and all steel liner" does not make the phrase "steel tank liner" a nullity. Rather, it simply further limits the type of precast concrete that the Government was not required to ship.

Contract interpretation is a matter of law for this court to determine. *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985). We agree with the trial court that the contract, as drafted by the Government, is subject to competing interpretations regarding the shipping obligation. In its argument before this court, the Government has merely shown that its proposed interpretation of this contract provision is one of them. The Government's interpretation is not unreasonable, but neither is the interpretation put upon it by Neal and by the trial judge. If the Government wants a particular interpretation to be made of a contract provision, it can write the provision to make that meaning clear. The Government has not shown us a basis for overturning the trial judge's determination of this matter; we affirm the award of the Claims Court for the shipping costs claim.

## CONCLUSION

The judgment of the Claims Court is affirmed.

AFFIRMED.