**NORTHROP GRUMMAN
CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 97–418C.

United States Court of Federal Claims.

Aug. 19, 1998.

Zell, P.C., and Charles E. Taylor, Chief, Contract Rights Counsel, Northrop Grumman Corporation, of counsel.

Shalom Brilliant, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Major Jessica Hayes, Air Force Legal Services Agency, Arlington, VA, of counsel.

## OPINION

MILLER, Judge.

Before the court after argument on cross-motions for summary judgment, this case addresses whether the Government breached a cost-plus-incentive-fee contract by unilaterally reducing plaintiff's fee for alleged failure to satisfy certain contract specifications.

## FACTS

The following facts are undisputed, unless otherwise noted. On November 2, 1990, the United States Air Force (the "Air Force") awarded sole-source Letter Contract No. F19628–90–0197 to Grumman Aerospace Corporation ("plaintiff")[1] for the development of a state-of-the-art aircraft called the Joint Surveillance and Target Attack Radar System ("Joint STARS"). The contract called for the reconditioning and transformation of an old Boeing 707 airplane into the world's most advanced battlefield management aircraft, with the capability to detect, track, and target both moving and stationary enemy ground forces and material through clouds, foliage, and other obscurants. Because plaintiff previously had developed two earlier versions of Joint STARS aircraft under a different contract, the contract at the center of the instant dispute governing the third Joint STARS aircraft has been designated by the parties as the Follow-on Full Scale Development ("FoFSD") Contract.

As a complex development project, the FoFSD contract was issued as a Cost–Plus–Incentive–Fee ("CPIF") contract as described by Federal Acquisition Regulation ("FAR") § 16.404–1, 48 C.F.R. § 16.404–1

J. William Eshelman, Washington, DC, for plaintiff. Michael C. Poliner, Douglas J. Feith, and J. Michael Littlejohn, Feith &

---

1. On December 31, 1996, Grumman Aerospace Corporation, a wholly-owned subsidiary of Nor-throp Grumman Corporation ("NGC"), merged into NGC.

(1990),[2] then in effect.[3] A CPIF contract is appropriate when "uncertainties involved in contract performance do not permit costs to be estimated with sufficient accuracy to use any type of fixed-price contract." FAR § 16.301–2, 48 C.F.R. § 16.301–2 (1997). Under this type of cost reimbursement contract, as opposed to a fixed-price type contract, the parties identify a target cost, target fee, minimum fee, and maximum fee. The contractor's fee is a function of the extent to which total allowable costs are less than or exceed the target cost. Once total allowable costs exceed the target cost, the contractor's fee will decline proportionately as cost increases. The converse is also true. The greater the contractor is successful in keeping total allowable costs below the target cost, the greater will be the contractor's fee. If total allowable costs are equal to the target cost, the contractor is entitled to the target fee. The fee may not exceed the identified minimum or maximum fees, regardless of the extent to which total allowable costs may be greater or less than the target cost.[4]

The FoFSD contract contained the following cost and fee provisions:[5]

| | |
|---|---|
| Target Cost: | $448,000,000.00 |
| Target Fee: | $38,844,000.00 |
| Minimum Fee: | $17,779,000.00 |
| Maximum Fee: | $60,424,000.00 |

These figures were subject to the Incentive Fee clause, FAR § 52.216–10, 48 C.F.R. § 52.216–10 (1990), which provided in pertinent part as follows:

(a) General. The Government shall pay the Contractor for performing this contract a fee determined as provided in this contract.

(b) Target cost and target fee. The target cost and target fee specified in the Schedule are subject to adjustment if the contract is modified in accordance with paragraph (d) below.

. . . .

(d) Equitable adjustments. When the work under this contract is increased or decreased by a modification to this contract or when any equitable adjustment in the target cost is authorized under any other clause, equitable adjustments in the target cost, target fee, minimum fee, and maximum fee, as appropriate, shall be stated in a supplemental agreement to this contract.

2. The section states, in pertinent part, as follows:

The cost-plus-incentive-fee contract is a cost-reimbursement contract that provides for the initially negotiated fee to be adjusted later by a formula based on the relationship of total allowable costs to total target costs. This contract type specifies a target cost, a target fee, minimum and maximum fees, and a fee adjustment formula. After contract performance, the fee payable to the contractor is determined in accordance with the formula. The formula provides, within limits, for increases in fee above target fee when total allowable costs are less than target costs, and decreases in fee below target fee when total allowable costs exceed target costs. This increase or decrease is intended to provide an incentive for the contractor to manage the contract effectively. When total allowable cost is greater than or less than the range of costs within which the fee-adjustment formula operates, the contractor is paid total allowable costs, plus the minimum or maximum fee.

3. Unless otherwise noted, all references to the FAR are to the provisions that the parties incorporated by reference into the FoFSD contract. Although the FAR has since been amended, the current provisions do not differ materially from those referenced herein.

4. Through the use of cost incentives, technical performance incentives, and delivery incentives, risk is borne by the Government and a contract awardee under a CPIF scheme more equitably than would be possible under a fixed-price contract scheme. See FAR §§ 16.402–1, 16.402–2, 16.402–3, 48 C.F.R. §§ 16.402–1, 16.402–2, 16.402–3 (1997). Cost incentives are designed to encourage the contractor to manage costs through the utilization of a formula that will result in an increase or decrease in the contractor's fee depending on whether total allowable costs exceed or are less than an identified target cost. Performance incentives are considered in connection with specific product characteristics or other specific elements of the contractor's performance, and relate profit or fee to results achieved by the contractor. Delivery incentives are used when "improvement from a required delivery schedule is a significant Government objective," and operate under a reward-penalty structure. FAR § 16.402–3, 48 C.F.R. § 16.402–3 (1997). Like most other incentive contracts, the FoFSD contract utilizes only cost incentives.

5. As issued on November 2, 1990, the FoFSD contract contained not-to-exceed target costs and fees. The contract was "definitized," or finalized, so as to replace the not-to-exceed targets with the following agreed-upon targets on October 26, 1992, pursuant to Modification PZ0023.

(e) Fee payable. (1) the fee payable under this contract shall be the target fee increased by [Contracting Officer insert Contractor's participation] cents for every dollar that the total allowable cost is less than the target cost or decreased by [Contracting Officer insert Contractor's participation] cents for every dollar that the total allowable cost exceeds the target cost. In no event shall the fee be greater than the [Contracting Officer insert percentage] percent or less than [Contracting Officer insert percentage] percent of the target cost.

. . . .

(3) If this contract is terminated in its entirety, the portion of the target fee payable shall not be subject to an increase or a decrease as provided in this paragraph. The termination shall be accomplished in accordance with other applicable clauses of this contract.

Rather than fill in the bracketed areas with the appropriate figures, the contracting officer identified a "share ratio" of 70/30. The parties agreed that plaintiff would earn 30 cents additional fee for each dollar of total allowable cost less than target cost. Correspondingly, plaintiff would lose 30 cents in fee for each dollar expended in excess of target cost, subject to the specified minimum and maximum fees.

The FoFSD contract also incorporated by reference the following standard FAR clauses, with pertinent provisions quoted below:

FAR § 52.246–8 Inspection of Research and Development—Cost Reimbursement

. . . .

(f) At any time during contract performance . . . the Government may require the Contractor to replace or correct work not meeting contract requirements. . . . Except as otherwise provided in paragraph (h) below, the cost of replacement or correction shall be determined as specified in the Allowable Cost and Payment clause, but no additional fee shall paid. . . .

(g)(1) If the Contractor fails to proceed with reasonable promptness to perform the required replacement or correction, the Government may—

(i) By contract or otherwise, perform the replacement or correction, charge to the Contractor any increased cost, or make an equitable reduction in any fixed fee paid or payable under the contract;

(ii) Require delivery of any undelivered articles and shall have the right to make equitable reduction in any fixed fee paid or payable under the contract; or

(iii) Terminate the contract for default.

(2) Failure to agree on the amount of increased cost to be charged the Contractor or to the reduction in fixed fee shall be a dispute.

. . . .

(j) The Contractor has no obligation or liability under the contract to correct or replace articles not meeting contract requirements at time of delivery, except as provided in this clause or as may otherwise be specified in the contract.

FAR § 52.246–8, 48 C.F.R. § 52.246–8 (1990).

FAR § 52.232–22 Limitation of Funds

(a) The parties estimate that performance of this contract will not cost the Government more than (1) the estimated cost specified in the Schedule or, (2) if this is a cost-sharing contract, the Government's share of the estimated cost specified in the Schedule. The Contractor agrees to use its best efforts to perform the work specified in the Schedule and all obligations under this contract within the estimated cost. . . .

FAR § 52.232–22, 48 C.F.R. § 52.232–22 (1990).

FAR § 52.243–2 Changes—Cost–Reimbursement

(a) The Contracting Officer may at any time . . . make changes within the general scope of this contract in any one or more of the following:

(1) Drawings, designs, or specifications. . . .

. . . .

(b) If any such change causes an increase or decrease in the estimated cost of . . . performance of any part of the work under this contract . . . the Contracting Officer shall make an equitable adjustment

in the (1) estimated cost, delivery or completion schedule, or both; (2) amount of any fixed fee; and (3) other affected terms and shall modify the contract accordingly. FAR § 52.243–2,48 C.F.R. § 52.243–2 (1990) (as modified in ¶¶ (a)(1) and (a)(3) by Alternate V (Apr. 1984)).

FAR § 52.249–6 Termination (Cost Reimbursement)

. . . .

(i) If the contract is terminated for the convenience of the Government, the settlement shall include a percentage of the fee equal to the percentage of completion of work contemplated under the contract, but excluding subcontract effort included in subcontractors' termination proposals, less previous payments for fee.

(ii) If the contract is terminated for default, the total fee payable shall be such proportionate part of the fee as the total number of articles (or amount of services) delivered to and accepted by the Government is to the total number of articles (or amount of services) of a like kind required by the contract.

FAR § 52.249–6(g)(4)(i), (ii), 48 C.F.R. § 52.249–6(g)(4)(i), (ii) (1990).

Once performance of the FoFSD contract was underway, plaintiff experienced difficulty in meeting contract cost and schedule requirements. By August 1995, the basic development portion of the contract was over budget and behind schedule. The contract provided that, prior to delivery, a variety of tests would be conducted, including Contractor Development Test and Evaluation ("DT & E"), Government DT & E, a Functional Configuration Audit ("FCA"), and a Physical Configuration Audit ("PCA"). After the aircraft's delivery, the contract recited that the Air Force would commence Multi–Service Operation, Test, and Evaluation ("MOT & E") for the purpose of testing the final Joint STARS configuration operationally. The target date associated with the commencement of MOT & E was June 1995. In addition to the target date, the parties also identified a threshold start date for MOT & E of December 1, 1995. They viewed this threshold date as critical for two reasons: First, if MOT & E failed to commence prior to December 1, 1995, the Joint STARS program would have to declare a breach; and, second, failure to meet this deadline would put in jeopardy authorization for the full rate production phase of the program, which required successful completion of MOT & E.

Plaintiff failed to commence MOT & E during the target period. As a result of continuing cost and scheduling overruns, and the imminent approach of the critical MOT & E threshold start date, defendant on August 11, 1995 "froze" further development of the aircraft in order to preserve the Joint STARS production schedule. Plaintiff completed Contractor DT & E, FCA, and PCA by September 15, 1995. Shortly thereafter, the Air Force took possession of the aircraft and completed the Air Force's DT & E on September 28, 1995.[6] On September 29, 1995, Stephen P. Kent, Contracting Officer for the Joint STARS projects notified plaintiff in writing that

[a]lthough important residual activities must still be accomplished in order to complete the contract, as of this date, the Joint STARS team has met its primary objective of completing the critical development activities that allow operational testing to begin. The Government sincerely appreciates the extraordinary efforts of the numerous contractor employees who have helped us reach this major program milestone.

In December 1995 the Air Force sent the aircraft to Bosnia to support Operation Joint Endeavor, at which time it conducted MOT & E; this phase of testing was successfully completed on March 26, 1996. Although the Joint STARS system designed by plaintiff did not conform in every detail to the original System Specification, the configuration designed by plaintiff now serves as the baseline

---

6. Defendant takes issue with the plaintiff's conclusion that the aircraft successfully completed Contractor and Government DT & E. Specifically, defendant asserts that it is precisely because the aircraft failed Contractor and Government DT & E that plaintiff was forced to submit the many Engineering Change Proposals, Contract Change Proposals, and requests for waiver that are at the center of this litigation.

for production of future Joint STARS aircraft.

In anticipation of potential difficulty in meeting scheduled target dates, plaintiff and the Air Force, as early as November 1994, were examining the Joint STARS System Specification in order to identify those specifications that might be relaxed or eliminated without compromising the contract's performance objectives.[7] Thus, by August 11, 1995, the date on which the Air Force froze further development efforts, the parties had identified approximately 175 Engineering Change Proposals ("ECPs"), Contract Change Proposals ("CCPs"), and requests for waiver of contract requirements, which plaintiff subsequently submitted to defendant for approval. In addition, plaintiff submitted three Requests for Equitable Adjustment ("REAs") for work scope increases that the Air Force added to the original contract. Confronted with an as-built configuration that deviated from original System Specification, and a considerable number of ECPs, CCPs, requests for waiver, and REAs, the parties decided to engage in an "omnibus" settlement negotiation aimed at resolving all outstanding changes to the contract rather than approach each change individually.

On December 21, 1995, plaintiff submitted its omnibus proposal. The Air Force accepted all CCPs, ECPs, and requests for waiver from a technical perspective; however, the proposal was considered incomplete because it did not address certain deleted or relaxed requirements of which plaintiff had been made aware to require consideration, even though the proposal did include downward adjustments to target cost and fee for deleted and relaxed requirements. In short, the Air Force considered that the amounts proposed by plaintiff as credits for work deleted to be unreasonably low, in view of the nature of the work proposed to be eliminated or relaxed under the contract's requirements. On February 16, 1996, plaintiff submitted an

updated proposal containing additional decreases in the contract target amounts on various specifications deleted or relaxed. The Air Force rejected the updated proposal on the grounds asserted previously. On April 12, 1996, the Air Force submitted a counteroffer to plaintiff, proposing "a net no-cost settlement, whereby the credits for work removed from the Contract would balance out the equitable adjustment to be made for work added to the Contract"; this would have left the targets unchanged from what they were at the time, taking into account the modifications made to the contract. Plaintiff rejected the counteroffer on April 16, 1996.

Following the failure of further negotiations, the Air Force transmitted to plaintiff Modification No. P00095, which incorporated all outstanding ECPs, CCPs, and requests for waiver that either deleted or relaxed contract requirements. Accompanying the modification was a request that plaintiff submit a proposal reflecting downward adjustments in target cost and fee in accordance with the FAR Changes and Incentive Fee clauses incorporated by reference into the contract. Plaintiff returned the modification unsigned. On November 20, 1996, defendant unilaterally executed Modification P00095.

Subsequent to plaintiff's refusal to sign Modification No. P00095, the contracting officer issued a final decision on the matter on January 28, 1997. Accompanying the decision was Modification P00097, which reduced the contract's target cost and fee based on Modification P00095. The reductions are as follows:

| | |
|---|---|
| Target Cost: | ($13,735,397.00) |
| Target Fee: | ($805,852.00) |
| Maximum Fee: | ($1,915,538.00) |
| Minimum Fee: | ($547,314.00) |

This reduction resulted in an alleged net fee loss for plaintiff amounting to $4,926,471.00,[8] and precipitated this suit.

---

7. Plaintiff asserts that defendant's decision to freeze the project despite its nonconformance with the System Specification is evidence of the parties' success in this endeavor. Defendant counters that plaintiff misunderstands the true purpose of this joint effort, explaining that it was conducted merely to identify the scope of the contract work that could be reduced without

compromising MOT & E, or operational testing—not to relax or eliminate any system specifications perceived not to bear a "critical" or "major" relationship to performance objectives.

8. In early February 1997 the parties executed bilaterally Modification P00089, increasing target cost, target fee, minimum fee, and maximum

## DISCUSSION

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). If there are disputed issues of material fact that might affect significantly the outcome of the suit, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When addressing cross-motions for summary judgment, the court may not weigh evidence. *See id.* at 255, 106 S.Ct. 2505. "[S]ummary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987) (citations omitted).

▇▇ Contract interpretation is a matter of law that may be resolved through summary judgment. *See Textron Defense Systems v. Widnall*, 143 F.3d 1465, 1468 (Fed. Cir.1998); *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985). When construing a contract, the court is to read the contract as a whole so as to give meaning to each of its provisions. *See McAbee Constr. Inc. v. United States*, 97 F.3d 1431, 1435 (Fed.Cir.1996). The court must "harmonize and give meaning to all of [the contract's] provisions." *Thanet Corp. v. United States*, 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979). "[A]n interpretation which gives a reasonable meaning to all [of a contract's] parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991) (quoting *Arizona v. United States*, 216 Ct.Cl. 221, 235–36,

575 F.2d 855, 863 (1978)). Contract provisions will not be construed in a manner causing them to come into conflict with one another, unless there is no other reasonable interpretation. See *International Transducer Corp. v. United States*, 30 Fed.Cl. 522, 526 (1994), *aff'd*, 48 F.3d 1235 (Fed.Cir.1995) (table).

Resolution of the instant dispute devolves to a determination of which party's interpretation of the contract prevails. Plaintiff regards the Air Force's decision, which is based on the Changes and Incentive Fee clauses, to reduce the target cost and target fee as contrary to the contract's express provisions, as well as based on an erroneous interpretation of the applicable legal principles. According to plaintiff, the only manner in which its fee could be reduced for alleged nonconformities is through application of the contract's Inspection clause. Plaintiff maintains that because it used its best efforts to comply with the contract's mandatory specifications, because its final product completed applicable tests, and because the as-built Joint STARS aircraft now operates as the baseline for future production, the Inspection clause provisions allowing a fee reduction cannot be invoked, and its fee cannot be reduced.

The success of plaintiff's arguments, as well as its ability to refute defendant's alternative interpretation, depends on its interpretation of several contract clauses. Plaintiff's "best efforts" theory is based on the Limitation of Funds ("LOF") clause. When operating under a CPIF contract, such as the FoFSD contract, plaintiff submits that a contractor is required to exert only its best efforts to comply with the contract's requirements. Thus, plaintiff complains that the Government has consistently, and erroneously, applied fixed-price contract principles to the instant dispute that involves a CPIF contract.

---

fee for the three REAs that were addressed during the omnibus negotiations as follows:

| | |
|---|---|
| Target Cost: | $16,753,561.00 |
| Target Fee: | $904,810.00 |
| Maximum Fee: | $2,336,452.00 |
| Minimum Fee: | $667,579.00 |

The modification unambiguously states that it was entered into pursuant to the authority of the " 'Changes' clause or any other provisions of the contract arising from or related to, the modifications contained herein." It also bears noting that the Air Force has reimbursed all of plaintiff's costs.

■ Plaintiff relies on *General Dynamics Corp. v. United States,* 229 Ct.Cl. 399, 410–11, 671 F.2d 474, 480–81 (1982), in which the court stated:

> Unlike a fixed-price contract, under which the contractor is obligated to deliver the material or service for the stated price, a cost-reimbursement contract merely requires the contractor to use its best efforts to provide the goods or services at the stated price.
>
> If, despite its best efforts, the contractor cannot meet the contractual requirements, the government has obtained precisely what it bargained for, namely, the contractor's best efforts.

Although this language appears initially to support plaintiff's interpretation, the applicable regulations undercut its position. In a CPIF contract, the Government allocates a certain level of funding to the project and agrees to compensate the contractor for all allowable and allocable costs associated with performance. Such contracts also generally include a LOF clause. When the level of funding noted in the LOF clause is reached, the contractor is not required to perform further until the Government determines whether it will allocate additional funding. For example, if the Government allocates $1 million to a project, the contractor is required to use its best efforts to complete the project within the $1 million limit. If the contractor has utilized all of the allocated funds, but has not performed fully, it is not required to perform further unless the Government commits additional funds to the project. The Government either can fund additional work or terminate the contract. The "best efforts" language refers to the contractor's duty in a CPIF contract to use its "best efforts" to complete the project within the funding limit allocated to the contract; it does not address a dispute that involves the propriety of a fee reduction based on the deletion or relaxation of contract specifications.

■ Again predicating its argument on the notion that a contractor is required to exert only its best efforts, plaintiff attempts to couch the dispute as one concerning nonconforming work that is governed solely by the contract's Inspection clause. Plaintiff postulates that the only commercially reasonable means for effecting a reduction in its fee, if at all, is through the Inspection clause. This clause permits the Government to inspect a contractor's work at any time during contract performance and invests the Government with the power to require the contractor to replace or correct work not meeting contract requirements. *See* FAR § 52.246–8(f), (g), 48 C.F.R. § 52.246–8(f), (g) (1990). The Government shoulders the cost of such replacements or corrections with the contractor in accordance with the cost, fee, and share ratio terms established pursuant to the Incentive Fee clause. In the instant case, for example, if the Government demanded that plaintiff replace or correct work, for each dollar expended in excess of the target cost, the Government would pay 70 cents, and plaintiff's fee would be reduced by 30 cents. A contractor is not entitled to receive any additional fee for work requested for corrections or replacements, and if a contractor fails to "proceed with reasonable promptness" in response to a request for replacement or correction, the clause contemplates a fee reduction. FAR § 52.246–8(g)(1), 48 C.F.R. § 52.246–8(g)(1) (1990).

Although it is indisputable that the as-built Joint STARS plane produced by plaintiff did not meet all of the contract's specifications, the Air Force nonetheless allowed the project to advance to the next stage of development, MOT & E. By virtue of the Joint STARS plane having advanced to MOT & E, plaintiff takes the position that the parties now are in contention regarding whether plaintiff can be penalized for failing to correct the deficiencies. Plaintiff insists that it cannot be penalized for failing to make corrections when the Air Force never asked it to do so. Moreover, plaintiff points out that the Air Force would have been required to fund any corrective work and that, because no such funds were forthcoming, no obligation was outstanding to perform further.[9]

---

9. This element of plaintiff's argument reflects its misunderstanding of the LOF clause. Plaintiff has failed to introduce any evidence suggesting that sufficient funds necessary to correct the defi-

These arguments are not persuasive. As defendant notes, this case does not involve a dispute over nonconforming work. If such were the case, then the Inspection clause might well be implicated. Neither party disputes that the as-built Joint STARS aircraft was permitted to progress to the next stage of development and now serves as the baseline model for the future production of Joint STARS planes. It also is undisputed that the Air Force allowed the as-built aircraft to advance through MOT & E only because it modified the contract by deleting, relaxing, or limiting certain performance specifications. In making this decision, the Air Force had to weigh the costs of requiring full performance of the contract against the possibility of falling so far behind schedule that the project could be fatally compromised.

In effect, the Air Force modified the contract in such a manner as to bring the as-built Joint STARS system into compliance with the contract. The Air Force, by doing so, made a conscious decision to allow a less-than-complete system to move forward in order to keep the project on track. Thus, when the as-built Joint STARS system was permitted to undergo MOT & E, it was not deemed deficient with respect to any of the deleted or relaxed requirements that are the subject of the instant dispute. Because the system was not deemed deficient, the components of the Inspection clause addressing nonconforming work are not implicated in the case at bar.

Plaintiff urges the court to adopt the logic of *North American Rockwell Corp.*, ASBCA No. 14329, 72–1 BCA ¶ 9207, 1971 WL 1503 (1971). The contractor in *Rockwell* entered into a CPIF contract to produce a lightweight fuel tank to be used in conjunction with an Air Force rocket development program. During the course of performance, the contractor encountered numerous difficulties resulting in significant cost overruns, several of which were funded by the Air Force, and some of which were not. Although it is true that *Rockwell* involves a fee dispute in a CPIF contract, the similarity ends there.

Unlike *Rockwell*, the instant dispute does not involve the LOF clause. This is an important distinction for several reasons. First, because the *Rockwell* contractor had already utilized all allocated funds and was in a cost overrun situation, the Government was faced with a choice of either funding additional work to correct deficiencies or accepting the product "as-is." Such a scenario arises only when the LOF clause has been implicated. Therefore, when the Government chose not to fund additional work, the Armed Services Board of Contract Appeals (the "Board") correctly treated the situation as tantamount to a termination for convenience and awarded the contractor a fee based on the percentage of the completion of the work contemplated by the contract. Second, as stated previously, the instant dispute does not involve non-conforming work, because the Air Force chose to eliminate or relax required contract specifications.[10] Because the aircraft was brought into compliance, the dicta cited by plaintiff for the proposition that it is impermissible to reduce the contractor's fee to account for deficiencies are irrelevant.

Plaintiff's related assertion based on its reading of *Rockwell* that no fee reduction is warranted under a cost reimbursement contract where the result is sufficient to carry out the contract's purpose is similarly erroneous. Unlike the FoFSD contract that contained only cost incentives, the parties in *Rockwell* included in their contract a performance incentive provision that adjusted the contractor's fee based on weight of the tank. With the exception of some minor discrepancies, the contractor fabricated a tank suitable for the purposes for which it was designed. The tank weighed 360 pounds less than the target weight, considerably below that

---

ciencies were lacking. As a consequence the suggestion that the Air Force's failure to fund corrective work obviated plaintiff's obligation to perform further is without merit. Only if the LOF clause had been implicated would plaintiff have had the option to suspend performance until additional funds were committed.

10. The court is aware that the Air Force has not yet accepted the Joint STARS plane and that problems other than those currently before the court allegedly have arisen subsequent to the deletion or relaxation of certain specifications.

weight necessary to achieve the maximum performance incentive. Despite the decision not to fund the correction of these discrepancies, as would have been appropriate in a cost overrun situation, the Government refused a fee award based on the performance incentive provision unless and until the Government accepted the tank as meeting all contract requirements. The contracting officer awarded the contractor a zero fee.

The Board determined that the contractor was entitled to the maximum performance incentive fee because the contractor succeeded in meeting the sole criterion articulated in the contract necessary for achieving the maximum performance fee, to wit, fabricating a tank below the prescribed weight. The Board explained that no contractual provision allowed the Government to deny payment of the performance fee because of minor discrepancies in the tank's construction that did not impair the purpose or objective of the contract. Plaintiff's interpretation of this aspect of decision requires an appreciable enlargement of the Board's rationale and, in addition, fails to account for the distinctions that may be drawn between *Rockwell* and the instant case.

*Rockwell* instructs that the Government may not deny payment of a contractor's performance fee, in its entirety, when the conditions for payment have been satisfied substantially. This does not mean that the Government is precluded from reducing fees for the elimination or relaxation of arguably major or critical contract specifications bearing no relation to the satisfaction of any specific performance incentive identified in the contract.

■ In contrast to plaintiff's strained interpretation, defendant has offered an alternative that allows the court to follow the Federal Circuit's guidance requiring that a contract be read "as a whole." *Lockheed*

*Martin Corp. v. Secretary of the Army,* 149 F.3d 1377, 1380 (Fed.Cir.1998); *see also Gould, Inc.,* 935 F.2d at 1274 (requiring that contract be read to give meaning to each of its provisions). Defendant suggests that its fee reduction is warranted because the contracting officer's actions were well within the ambit of the contract's Changes and Incentive Fee clauses.

According to defendant, the contracting officer followed the provisions of the Changes clause by altering the contract's specifications. Having done so, the contracting officer could utilize the provisions of FAR § 52.243–2(b), which authorize an equitable adjustment in the contract's estimated cost or any other affected terms.[11] Defendant also notes correctly that the FoFSD contract's target cost was related directly to the estimated cost of the contract. Therefore, by adjusting the contract's estimated cost, the contracting officer was permitted to adjust the target cost on which plaintiff's fee was based.

Having issued a unilateral equitable adjustment, the contracting officer was entitled to invoke the contract's Incentive Fee clause, FAR § 52.216–10(b), 48 C.F.R. § 52.216–10(b) (1990). This clause states that "[t]he target cost and target fee specified the Schedule are subject to adjustment if the contract is modified in accordance with paragraph (d) below." Paragraph (d), quoted above, permits equitable adjustment of target cost and target fee and minimum and maximum fees when work under a contract is increased or decreased by a modification to the contract.

Pursuant to the Incentive Fee clause, defendant need only demonstrate that work under the contract was decreased. Because the deletion or relaxation of certain requirements did reduce the work required, the

---

11. The court is not persuaded by plaintiff's argument that the Changes clause is applicable only to fixed-price contracts. First, as defendant states, the Changes clause was incorporated expressly into the instant contract. Second, the same Changes clause was utilized by the parties to modify the contract in favor of plaintiff on other occasions. Third, the FAR specifies a Changes clause applicable to fixed-price con-

tracts and different Changes clause for cost reimbursement contracts. *Compare* FAR § 52.243–1, 48 C.F.R. § 52.243–1 (1997) ("Changes–Fixed–Price"), *with* FAR § 52.243–2, 48 C.F.R. § 52.243–2 (1997) ("Changes–Cost Reimbursement"). Finally, the clause is broad enough to encompass contracts such as the one before the court.

Incentive Fee clause was applied properly to reduce plaintiff's fee.

In an effort to render defendant's interpretation commercially unreasonable, plaintiff suggests that application of the Incentive Fee clause produces arbitrary results. The lynchpin of this argument is that the relaxation or elimination by the Air Force of certain specifications did not reduce the contract's scope of work. Plaintiff notes that the parties agree that the target cost and target fee could be adjusted "by *prospective* changes to the Contract's scope of work—*i.e.,* (a) the addition of work not originally required under the Contract and (b) the deletion during the course of performance of work originally required but not yet done." Plf's Br. filed Apr. 3, 1998, at 18. Having been informed that the parties agree to the situations under which the target cost and target fee may be adjusted, the court is unable to discern why plaintiff finds the Air Force's actions to be beyond the agreed-upon terms.[12]

When the Air Force learned that plaintiff had encountered problems that were hindering delivery of the Joint STARS plane and threatening the viability of the entire project, it chose to delete "during the course of performance ... work originally required but not yet done." Plf's Br. filed Apr. 3, 1998, at 18. The work originally required consisted of the requirements that were deleted or relaxed. Because the as-built Joint STARS plane did not yet comply with those requirements, the work was not yet "done." In short, the Air Force's actions are on all fours with plaintiff's own characterization of when adjustments may be made to the target cost and target fee.

The court is not persuaded by plaintiff's suggestion that the Air Force has engaged in a retrospective deletion or relaxation of requirements based on plaintiff's past performance. First, when the Air Force decided to eliminate or relax certain requirements, and subsequently reduced plaintiff's fee, the contract was in the process of being performed. Second, plaintiff admits that as early as 1994 plaintiff and the Air Force began an accelerated joint effort to "identify specific Contract items and tasks not essential to MOT & E that could be tailored to minimize costs and schedule risk without compromising the Contract's performance objectives." Plf's Proposed Findings of Fact No. 22, filed Apr. 3, 1998. The many ECPs, CCPs, and requests for waiver that resulted in the unilateral reduction of plaintiff's fee were subject to negotiation long before plaintiff relinquished the aircraft to the Air Force for MOT & E and before any communication from or action by the Air Force that possibly could be construed as acceptance of the as-built configuration.[13] Finally, in weighing whether to issue the modifications, the Air Force was guided, in part, by the manner in which work had thus far progressed. The Air Force was aware of the problems that had plagued the project since its inception and determined that allowing plaintiff to continue to attempt to meet all outstanding requirements would jeopardize the project. Thus, the Air Force attempted to modify the contract in a manner that took into account the amount of funds that would be expended by plaintiff in fulfilling the outstanding requirements—for which plaintiff would be reimbursed—and the corresponding fee reduction. Although the reasonableness of the Air Force's estimate is open to question, defendant's interpretation of the contract that permits the Air Force to engage in the enterprise is reasonable.

Plaintiff offers two points to summarize the essence of its complaint: first, that con-

---

**12.** It also bears noting that plaintiff has yet to provide an adequate explanation as to why the Changes and Incentive Fee clauses provided a proper basis for upward adjustment of the target cost, target fee, and minimum and maximum fees in the execution of Modification P00089, yet may not be invoked for a downward adjustment of costs and fees.

**13.** In its briefs defendant expressly refutes the contention that the Air Force has accepted the aircraft. Defendant also indicated at oral argument that the Air Force has since awarded separate, supplemental contracts to bring the as-built configuration of the aircraft into compliance with the specifications of the original unmodified FoFSD contract. During argument defendant asserted, and plaintiff did not dispute, that some of these supplemental contracts have been awarded to plaintiff.

tract language should not be given literal meaning if it leads to a commercially unreasonable result; and, second, that defendant's unilateral reduction of target costs and fees was conceptually unreasonable, primarily because the reductions were retrospective in nature. In *Northrop Grumman Corp. v. Goldin*, 136 F.3d 1479 (Fed.Cir.1998), a case brought by plaintiff, the Federal Circuit indeed was guided by the principle that a contract should be so construed as to give reasonable meaning to all of its parts. The contract in that case failed to include a contract or recite language addressing expressly the factual circumstances giving rise to the dispute, and the court was required to synthesize two potentially applicable contract provisions in order to arrive at what the court considered to be the only reasonable interpretation. This is not the case at bar. First, the facts fall well within the compass of the Changes and Incentive Fee clauses. Second, plaintiff's characterization of the negotiations preceding the unilateral execution of Modification P00095 as "retrospective" is groundless. Contract modifications do not transform automatically into post-acceptance, waived nonconformities because the parties fail to agree on the value of such modifications prior to a critical testing date requiring a transfer of possession from the contractor to the Government. To suggest that such a transformation does occur is no less "conceptually unreasonable," Transcript of Proceedings, *Northrop Grumman Corp. v. United States*, 41 Fed.Cl. 645 (1998), than to acknowledge the legitimacy and propriety of Modification P00095. Otherwise, a contractor could refuse to cooperate in any bilateral negotiation regarding the value of a downward adjustment of costs or fees pursuant to a contract modification, force the Government to accept a nonconforming product "as is," and contest a legitimate fee reduction. Third, to the extent that the target reductions in this case impose a commercially unreasonable burden upon plaintiff, plaintiff will have the opportunity to challenge the amount of reduction in future proceedings.

Having found the Government's position meritorious as to the proper interpretation of the FoFSD contract, the court is next required to address the issue of whether the case should continue for a determination of the proper quantum of fee reduction to which the Air Force was entitled. The crux of defendant's assertion in favor of having its summary judgment motion encompass quantum is that plaintiff did not challenge the fee reduction in its complaint. Plaintiff responds with several arguments militating against resolving the quantum issue through the filings currently before the court.

As an initial point, plaintiff notes that in its claim challenging the merits of the fee reduction it also challenged the amount of the reduction. Second, plaintiff is correct in asserting that the court limited discovery to the issue of liability. The court's rationale for doing so is evident in that, were plaintiff to prevail, the parties would be spared the significant time and expense associated with discovering and briefing the quantum issues. Simply because plaintiff has not prevailed on the issue of liability does not necessarily mean that the Air Force was correct in reducing plaintiff's fee by approximately $5 million. Such a determination can only be made after the parties have engaged in the discovery necessary to frame properly the issue of quantum.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. Defendant's cross-motion for summary judgment is granted as to liability and is otherwise denied.

2. Plaintiff's cross-motion for summary judgment is denied.

3. The parties shall submit a Joint Status Report by September 9, 1998, proposing a course of further proceedings.