OMNI CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 96–86C.

United States Court of Federal Claims.

Aug. 20, 1998.

Jeffrey E. Greene, Washington, DC, attorney of record for plaintiff. Crowell & Moring, of counsel.

Armando O. Bonilla, Department of Justice, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. David M. Cohen, Director, Joseph A. Kijewski, Assistant Director, and Lanny R. Robinson, United States Army Corps of Engineers, of counsel.

## OPINION

FUTEY, Judge.

This contracts case is before the court on defendant's motion for summary judgment and the cross-motion for summary judgment filed by plaintiff, Omni Corporation ("Omni").[1] Defendant argues that plaintiff was contractually obligated to staff equipment mechanics at each of two locks and dams plaintiff operated and maintained for defendant. Defendant asserts that the failure to staff equipment mechanics specifically resulted in the receipt of deficient services for which defendant alleges it justifiably withheld funds due under the contract. Plaintiff responds that the contract contained no such requirement, and any obligations were addressed to the performance of work rather than the staffing of specific positions. Plaintiff maintains that as its performance was not deficient, defendant's withholding of funds was unjustified.

### Factual Background

On June 2, 1992, the United States, acting through the Department of the Army Corps of Engineers, Vicksburg District ("Army Corps"), issued Request for Proposal No. DACW38–92–R–0029 for the operation and maintenance of two government-owned locks and dams located on the Red River Water-

---

1. The court permitted defendant to file under seal Defendant's Response to Plaintiff's Cross–Motion for Summary Judgment and Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment, Defendant's Statement of Genuine Issues, and Defendant's Supplemental Appendix. This opinion, however, is not filed under seal since it does not make specific reference to the sensitive and proprietary information defendant sought to protect.

way in Louisiana. The two locks and dams are known as the John H. Overton Lock & Dam ("Overton L & D") and Lock and Dam No. 3 ("L & D No. 3").

The solicitations contain several sections at the heart of this case. · Section H.1.1, Minimum Personnel Requirements, states, "The Contractor shall provide the personnel necessary to accomplish all of work [sic] required by this specification within the time limits specified." [2] The solicitation later states at section H.1.1.1.2, following sections labeled Historical Personnel Information and Typical Work Schedule, that "[t]he above information is provided for informational purposes only and is not intended to reflect a mandatory staffing level nor a warranty by the Government that this staffing level will always be sufficient to accomplish the required work." [3]

Another section is labeled "DEDUCTIONS FOR DEFICIENT WORK." That portion of the solicitations, H.26, provides that

> [d]eductions ... will be made for services that have been cited as not clearly meeting the standards set forth in the ... "Performance Requirements" in Section C, the Performance Requirements tables in the appendices of Section C or any other portion of the contract specifications.[4]

Procedures are given for handling deductions for "documented defects" in the following situations: "[e]ach service found deficient and performed by the Government;" "[e]ach service found deficient and performed by another contractor;" and "[e]ach service found deficient and not reperformed by anyone, or work not performed at all." [5]

Section C provides a description and specification of the work to be performed. The scope of work is defined as "operation and routine maintenance of [the Overton L & D

and L & D No. 3]." [6] Appendix A of Section C, in describing the contractor's duties related to dam operation, states, "The Contractor shall provide all plant, labor, equipment, materials, and supplies necessary to perform" [7] the enumerated duties. All subsequent appendices in Section C, including Appendix D concerning "Lock and Dam Maintenance and Repair," repeat the above-quoted language in listing the contractor's requirements for performance of the listed duties.

Section L contains instructions, conditions, and notices to offerors. In Section L.30.2.1, offerors are instructed, in the manpower section of their proposals, to "[i]nclude all discussion of manpower proposed for accomplishment of work included [sic] travel, organization chart and seasonal nature of work." [8] At section L.31.1.2, concerning technical requirements, proposals are required to "[p]rovide an analysis of the manpower proposed to accomplish all work. For each appendix, the manpower effort shall be given by work level and skill group, i.e., ... lock and dam equipment mechanic...." [9]

Section M details the evaluation factors for award of the contract. The solicitation informs offerors that in the evaluation of the proposal's technical capability (among other categories), manpower is the most important factor.[10] Section M.4 states: "Award will be made to the highest evaluated offeror whose offer conforms to the solicitation and has been evaluated as most advantageous to the Government considering all factors including technical and Management capability and cost." [11] Section M.5 is titled *Relationship of Accepted Proposal content to the Contractor Requirements.*" Section M.5 advises offerors that

> *by the submission of an offer pursuant to this solicitation, you, as the offeror,*

---

**2.** Appendix to Defendant's Motion for Summary Judgment, Exhibit (Def.'s Ex.) 18 at 3; Appendix to Plaintiff's Motion for Summary Judgment, Exhibit (Pl.'s Ex.) 1 at 78.

**3.** Def.'s Ex. 18 at 4; Pl.'s Ex. 1 at 79.

**4.** Def.'s Ex. 18 at 6; Pl.'s Ex. 1 at 103.

**5.** Def.'s Ex. 18 at 6–7; Pl.'s Ex. 1 at 103–104.

**6.** Pl.'s Ex. 1 at 32.

**7.** *Id.* at 44.

**8.** Def.'s Ex. 18 at 8; Pl.'s Ex. 1 at 243.

**9.** Def.'s Ex. 18 at 10; Pl.'s Ex. 1 at 245.

**10.** Def.'s Ex. 18 at 13; Pl.'s Ex. 1 at 257.

**11.** Def.'s Ex. 18 at 14; Pl.'s Ex. 1 at 258.

*agree that the capability presented in your proposal which is in excess of the minimum capability requirements of this solicitation, as accepted by the Government, and upon award of a contract, thereby becomes an additional contract requirement for equivalent capability.* Subsequently, a failure to provide such additional capability *which results in deficient contract performance,* can place the contract in jeopardy of default.[12]

On October 6, 1992, Omni submitted its best and final offer, with accompanying technical and cost proposals. In the cover letter to its proposal, Omni offered:

The owners and officers of Omni Corporation commit the resources and capabilities of the Company, and the personal efforts of our professional managers, engineers, and administrators to the realization of the goals established by the Vicksburg District through this procurement. These are not just words in a proposal—this is a firm commitment—backed by integrity and a reputation of excellence in performance.

. . . .

. . . Our staffing approach helps us retain flexibility as additional work is assigned or less work is required. . . . We firmly believe that if a competitor proposes a lesser staffing level . . . it would result in critical work not getting accomplished to the standards desired by the Corps.[13]

In the Manpower section of its proposal, Omni discussed its staffing plan. Among the support personnel Omni planned for the Overton L & D and L & D No. 3 was an equipment mechanic.[14] Later in its proposal, Omni stated that "[t]he Equipment Mechanic assigned to each lock and dam is responsible for performing all maintenance, preventive and corrective, with the assistance of the Lock and Dam Operators and Mechanic Helper."[15] In its cost proposal, which is stated as prepared in accordance with instructions given in section L of the solicita-

tions, Omni factors in an equipment mechanic at each lock and dam for the potential five-year life of the contract.

Omni's bid was accepted by the Army Corps, and Contract No. DACW38–93–D–0002 was awarded to Omni on October 28, 1992. The contract is characterized as a competitively negotiated firm-fixed-price contract. On November 30, 1993, November 28, 1994, December 4, 1995, and November 29, 1996, respectively, Contract Modification Nos. P00010, P00016, P00024, and P00031 were issued, exercising the contract's first, second, third, and fourth option years.

The equipment mechanic at the Overton L & D resigned on January 26, 1993. There was no equipment mechanic at the Overton L & D from January 26, 1993 to August 29, 1993, and also from July 4, 1994 to August 19, 1995. The equipment mechanic at L & D No. 3 resigned on November 7, 1993. There was no equipment mechanic at L & D No. 3 from November 7, 1993 to November 2, 1995. During the periods in which an equipment mechanic was not present, Omni asserts that the tasks ordinarily handled by the equipment mechanic were performed by the lock foreman.

Omni submitted monthly invoices to the Army Corps that contained contract line items ("CLINs") for services performed pursuant to the contract. With one exception,[16] the government fully paid all invoices submitted by Omni from December 4, 1992 through October 16, 1995.

The minutes from weekly meetings between Omni and Army Corps officials indicate that the absence of an equipment mechanic was regularly noted. On November 14, 1994, the contracting officer ("CO") notified Omni that section M.5 of the contract required that Omni staff a full-time equipment mechanic at each lock and dam. By letter dated February 1, 1995, Omni disputed this purported contract requirement and requested a CO's final decision on the matter.

---

12. Def.'s Ex. 18 at 14–15; Pl.'s Ex. 1 at 258–259 (second emphasis added).

13. Def.'s Ex. 2 at 3–4.

14. *Id.* at 17.

15. *Id.* at 24.

16. The Army Corps deducted $156.11 from Omni's July 14, 1995 invoice. This deduction is not at issue in the present case.

The letter states Omni's position that "[s]ection M.5 does not impose a minimum staffing requirement, as you suggest. Section M.5 is phrased in terms of *capability* rather than 'staffing'...." [17] The letter further proffers, "Section M.5 states that in order for a failure to meet additional capability to rise to the level of a default under the contract, that failure must result in 'deficient *performance.*'" [18] On May 2, 1995, the CO issued his final decision in which he found that a full-time equipment mechanic was required at each lock and dam by the terms of Omni's proposal as negotiated into the contract. The CO additionally directed Omni to fill the vacant positions and reserved the government's right to reduce the price of the contract as a means of reflecting any reduced value in services performed by Omni.

The CO issued a second final decision on November 7, 1995 in which he informed Omni he was exercising the reserved right of contract price reduction in the amount of $119,057.73. The CO calculated the deduction as the value of diminished services he found had been received by virtue of the lack of an equipment mechanic at the Overton L & D and L & D No. 3. The CO demanded payment within 30 days, and stated that the failure to do so would result in crediting this amount to the government through withholdings from existing unpaid or future invoices. Further, the CO declared that future equipment mechanic vacancies would result in future deductions from the contract price. By a November 30, 1995 letter, Omni informed the CO that the Overton L & D and L & D No. 3 had equipment mechanics on staff as of August 20, 1995 and November 7, 1995, respectively. On December 8, 1995, the CO replied that his earlier calculations did not reflect adjustments applicable to vacancies during October and November 1995. As a result, the failure of Omni to have a full-time equipment mechanic in place at L & D No. 3 until November 7, 1995 resulted in the CO

additionally deducting $3,473.30 from Omni's October 1995 invoice, and $632.44 from the November 1995 invoice. The CO noted again that future failures to staff equipment mechanics would result in future deductions from invoices. In total, the government subsequently deducted $3,473.30 from Omni's October 1995 invoice, withheld the entire $82,719.21 amount of Omni's November 1995 invoice, and deducted $36,970.96 from the December 1995 invoice. These deductions and withholdings totaled $123,163.47.

On January 19, 1996, Omni submitted a "certified claim" to the CO seeking "to recover $124,063.47 wrongfully withheld from Omni's invoices." [19] Plaintiff stated that "[t]he basis for this claim is the [CO's] erroneous interpretation of the contract ... to require Omni to provide mechanics to be available ... even though contract performance has been unaffected by the absence of such personnel." [20] On January 29, 1996, the CO responded that he refused to consider Omni's "claim" as either a proper contractor claim, a legitimate request for reconsideration from either prior final decision, or a proper request for deferment or installment payment.

Omni filed its complaint on February 12, 1996 as an appeal from the CO's final decisions of May 2, 1995 and November 7, 1995 as well as the CO's January 29, 1996 refusal to issue a final decision from plaintiff's purported January 19, 1996 claim. Plaintiff seeks recovery of withheld monies plus interest, and attorney' fees and other expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 (1994). Defendant filed its motion for summary judgment on January 27, 1997. On November 5, 1997, plaintiff filed its cross-motion for summary judgment.

*Discussion*

I. Motion for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact

---

17. Def.'s Ex. 5 at 1; Pl.'s Ex. 17 at 1.

18. .*Id.*

19. Def.'s Ex. 14 at 1. Omni, in this "claim" and its complaint, sought $124,063.47. Plaintiff explains in its motion to dismiss, at footnote 2, that it has decreased this amount by $900. The reason for the downward adjustment is that the

original figure was based on what the Army Corps allegedly indicated it would withhold, which turned out to be less than expected. Therefore, plaintiff seeks $123,163.47 plus interest.

20. *Id.*

and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Secretary of DHHS*, 998 F.2d 979 (Fed.Cir. 1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed. Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the non-moving party, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987)). Summary judgment will not necessarily be granted to one party or another simply because both parties have moved for summary judgment. *Corman v. United States*, 26 Cl.Ct. 1011, 1014 (1992) (citing *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692–93 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969)). A cross-motion is a party's claim that it alone is

entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States*, 33 Fed.Cl. 514, 518 (1995). It, therefore, does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman*, 26 Cl.Ct. at 1014).

The parties present the court with two issues for decision. First, the court is asked to decide whether the contract required that plaintiff staff each lock and dam with a full-time equipment mechanic.[21] Second, if the court answers the first question affirmatively, the court is then asked to decide whether defendant properly reduced the contract price and withheld monies from plaintiff.

## II. Contract Interpretation

■ The first issue presents the court with questions of contract interpretation. The court may rule on those interpretations as a matter of law. *National Rural Utils. Co-op Fin. Corp. v. United States*, 14 Cl.Ct. 130 (1988), *aff'd*, 867 F.2d 1393 (Fed.Cir. 1989). Furthermore, questions of contract interpretation are issues of law and may be disposed of on summary judgment. *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984). The court must construe the contract by its plain and unambiguous language. *National Rural*, 14 Cl.Ct. at 136.

■ It is a well-established principle of contract interpretation that "the language of a contract must be given that meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances." *Hol-Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 351 F.2d 972, 975 (1965). Contract interpretation ordinarily begins with "the plain meaning of the provision in question." *S.W. Aircraft Inc. v. United States*, 213 Ct.Cl. 206, 551 F.2d 1208, 1212 (1977). "Generally, the plain language of a contract controls, and only language which is reasonably suscepti-

---

21. Plaintiff phrases the issue slightly differently. The court is asked to decide whether the only reasonable reading of the contract requires an equipment mechanic at each lock and dam.

ble to more than one meaning may be considered ambiguous." *Thermal Electronic, Inc. v. United States,* 25 Cl.Ct. 671, 673 (1992) (citing *Neal & Co. v. United States,* 19 Cl.Ct. 463, 471 & n. 4 (1990), *aff'd,* 945 F.2d 385 (Fed.Cir.1991); *John C. Grimberg Co. v. United States,* 7 Cl.Ct. 452, 457, *aff'd,* 785 F.2d 325 (Fed.Cir.1985)). In interpreting a contract, the court seeks to "effectuate its spirit and purpose." *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991) (quoting *Arizona v. United States,* 216 Ct.Cl. 221, 575 F.2d 855, 863 (1978)). A court must give reasonable meaning to all parts of the contract "so as to harmonize and give meaning to all its provisions," and not render portions of the contract meaningless. *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 591 F.2d 629, 633 (1979); *see also Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985). Furthermore, "an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Arizona,* 575 F.2d at 863. "It is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight in its interpretation." *Blinderman Constr. Co. v. United States,* 695 F.2d 552, 558 (Fed.Cir. 1982). This is so because "how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself." *Macke Co. v. United States,* 199 Ct.Cl. 552, 467 F.2d 1323, 1325 (1972).

### A. Contentions of the parties

 Defendant asserts the contract at issue was competitively negotiated as a firm-fixed-price contract. Defendant lists several conditions, without citation to authority, that plaintiff must meet to prevail.[22] Plaintiff's October 6, 1992 technical proposal is read as providing for the staffing of a full-time equipment mechanic at the Overton L & D and L & D No. 3. For additional support, defendant references the cost analysis which accompanied plaintiff's proposal. Defendant notes that the cost proposal accounted for a full-time equipment mechanic at each of the locks and dams for the life of the contract, including option years. By accepting plaintiff's technical and cost proposals, defendant argues that the alleged representation of a full-time equipment mechanic at each lock and dam was incorporated into a contract consisting of these proposals and the solicitation requirements.

Plaintiff responds that the contract was a firm-fixed-price contract for services, such that defendant contracted, and subsequently remitted payment, for maintenance and operation of the Overton L & D and L & D No. 3. Plaintiff argues that the contract contained no requirement for an equipment mechanic. Therefore, plaintiff argues that the government's insistence upon equipment mechanics ignores the language of the contract and, instead, evidences an attempt to impose a solicitation evaluation criterion onto the contract. For support, plaintiff notes that the solicitation defines the scope of the contract as operation and routine maintenance of the two locks and dams at issue. Furthermore, the contractor is directed to provide "labor" in performance of the required tasks, without reference to filling any specific roles.

### B. Capability, staffing, and manpower

Defendant asserts that the term "capability," as used in the solicitation and contract documents, "explicitly encompasses minimum 'staffing levels' or, more precisely, 'manpower' requirements."[23] In support of this proposition, defendant states that section M.3.1 informed bidders that manpower was the most important element in evaluation of a contractor's technical capability. Defendant additionally directs the court to section L.31.1.2, the section on technical require-

---

**22.** Defendant claims that to rule in favor of Omni, the court would have to hold that a contractor may propose "heightened" services to obtain a contract, include their costs in its best and final offer, deliver "diminished and/or different" services during performance, and charge "the now grossly-inflated 'fixed' price." Defendant's Motion for Summary Judgment (Def.'s Mot. Summ. J.) at 13.

**23.** Def.'s Mot. Summ. J. at 15.

ments, which instructs bidders to "[p]rovide an analysis of the manpower proposed to accomplish all work. For each appendix, the manpower effort shall be given by work level and skill group, i.e., ... lock and dam equipment mechanic...."[24] Plaintiff responds by noting that the contract requirements were defined in terms of work, and expressly disclaimed mandatory levels of staffing.

Defendant fails to persuade the court that any specific "manpower" or "staffing levels" are mandated by these sections. While the solicitations inform bidders that manpower is the most important factor in the evaluation of technical capability, what the bidders are instructed to provide is an analysis of the proposed manpower to accomplish the work. In no way is the contractor placed on notice that the contents of this analysis will be incorporated into the contract as a staffing requirement. By also considering other sections of the solicitations, it becomes clear that to adopt defendant's view would "achieve[ ] a weird and whimsical result." *Arizona*, 575 F.2d at 863.

Section H.1.1 also touches upon the issue of staffing. Whereas section L.31.1.2 required an analysis of manpower, section H.1.1 is specifically titled "Minimum Personnel Requirements." In section H.1.1, the contractor is required only to "provide the personnel necessary to accomplish all ... work required by this specification within the time limits specified."[25] A subsequent section, H.1.1.1.2, discusses historical staffing and personnel information, but specifically states that such "information is ... for informational purposes only and is not intended to reflect a mandatory staffing level...."[26] These solicitation sections concerning personnel fail to mandate a particular staffing level, require the staffing of specific posi-

tions, or inform that proposed staffing will become a contract requirement.

In plaintiff's requests for admissions, defendant admitted that neither section L.31 nor section H.1, which directly address manpower issues, contained minimum capability requirements regarding staffing of equipment mechanics.[27] Defendant asserts, however, that should the court find that either "manpower" or "staffing levels" is encompassed within the solicitations' definition of "capability," section M.5 serves to defeat plaintiff's claim. Section M.5 informs bidders that to the extent the "capability" presented by their proposals exceeds the solicitation requirements, that excess "capability" becomes an additional contract requirement. Defendant failed to direct the court to any section of the solicitations which contained a minimum requirement regarding staffing. Plaintiff argues that despite any conceivable plausibility to defendant's argument, defendant's interpretation "is counter to both the general purpose and the express terms of both the Solicitation *and* this firm-fixed-price Contract."[28] An analysis of section M.5 leads the court to agree with plaintiff.

The court does not find that the term "capability" encompasses any required manpower or staffing levels. "Capability" is defined as "1. The quality or state of being capable: ABILITY. 2. Potential ability ... 3. The capacity to be used, treated, or developed for a particular purpose." Webster's II New Riverside University Dictionary (1988). This contract was one for services[29] or, in other words, "[e]mployment in duties or work for another." *Id.* There are no staffing requirements for bidders to meet. Therefore, it follows that this solicitation contains no "minimum capability requirements" con-

---

24. Def.'s Ex. 18 at 10; Pl.'s Ex. 1 at 245.

25. Def.'s Ex. 18 at 3; Pl.'s Ex. 1 at 78.

26. Def.'s Ex. 18 at 4; Pl.'s Ex. 1 at 79.

27. Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Appendix 1 at 2–3.

28. Plaintiff's Motion for Summary Judgment (Pl.'s Mot. Summ. J.) at 11.

29. For additional indication that the contract was for services, as opposed to manpower, plain-

tiff refers the court to the invoices sent from plaintiff to defendant, and from which defendant remitted payment to plaintiff. Generally speaking, the invoices bill the government for "services provided." The invoices presented as evidence contain no billing item for an equipment mechanic, but rather, indicate that Omni billed the government for, among other things, "lock and dam maintenance." Def.'s Ex. 10; Pl.'s Ex. 11.

cerning staffing levels. If a successful bidder presented a level of service exceeding solicitation requirements, the court agrees those proposed capabilities would become contract requirements. To the extent plaintiff's proposal indicated plaintiff's intent to perform the services required by, or even exceeding, the solicitation, this clause would be implicated.[30] That, however, is not this case. Questions of staffing levels, standing alone from issues of "capability" or "services," are not raised by section M.5.

Additionally, even if the court found that plaintiff's plan to employ equipment mechanics at the Overton L & D and L & D No. 3 evidenced a heightened capability such that it became a contract requirement, the failure to staff each lock and dam with equipment mechanics, alone, does not justify the withholding of monies from plaintiff. Section M.5 also states that to the extent the failure to provide heightened capability results in "deficient contract performance," the contract can be placed in "jeopardy of default." Reading the plain language of the contract, the court notes a contractor could propose but not provide heightened capability, and face no negative consequences so long as there was no resulting deficiency in performance. In any event, deficient contract performance could conceivably place the contract into default, but there is no provision in section M.5 for the withholding of monies due under the contract.

The issue of deductions for deficient performance is set out at section H.26. These sections further indicate that the government's withholdings were unjustified. Section H.26 states that deductions will be made for "services that have been cited as not clearly meeting the standards set forth" [31] in the performance requirements in section C or its appendices, or any other portion of the specifications. There is no indication that, as relates to the equipment mechanics issue, plaintiff has been cited for not providing the *services* required by section C or the specifications. Furthermore, section C and its appendices speak in terms of "work" and the "labor" contractors are to provide; there is no mandate for equipment mechanics *per se*. Additionally, section H.26 discusses procedures for handling deductions for "documented defects" in three situations, and each situation refers to "service[s] found deficient" rather than the lack of an equipment mechanic. To the extent the lack of an equipment mechanic resulted in a "documented defect" of a "service found deficient," the deduction procedures would have been implicated.

This, however, is not the situation presented by this case.[32]

## C. Omni's statements and actions

Defendant cites *Macke* for its position that plaintiff's actions before the commencement of this litigation indicate plaintiff's "intent and understanding that these formal proposals would become contract requirements." [33] Defendant supports this thesis, first, from the cover letter to Omni's technical proposal, and second, from Omni's staffing of the equipment mechanic positions at contract commencement and later attempts to fill any vacancies that occurred.[34]

---

**30.** Plaintiff asserts it proposed no services beyond those specified in the solicitation. Pl.'s Mot. Summ. J. at 14.

**31.** Def.'s Ex. 18 at 6; Pl.'s Ex. 1 at 103.

**32.** Defendant also cites section E.1 to justify the withholdings. Section E.1 allows for contract price reductions "to reflect the reduced value of the services performed" in the event that "defects in services cannot be corrected by reperformance." Def.'s Ex. 18 at 2; Pl.'s Ex. 1 at 74. What the court finds interesting about that section is that it defines "services" as including "services performed, workmanship, and material furnished or utilized in the performance of services." *Id.* Since this section fails to define the

provision of any manpower as a service, the court wonders what basis this section would provide for any price reduction in the circumstances of this case.

**33.** Def.'s Mot. Summ. J. at 18.

**34.** While defendant essentially argues that plaintiff's understanding of its contractual duties changed with the onset of litigation, the court finds it interesting that the solicitation evaluation language of section M.5 was altered when the Army Corps issued Solicitation No. DACW66–98–R–0003 in late 1997. *See* Plaintiff's Reply to Defendant's Response to Plaintiff's Cross–Motion for Summary Judgment at 7–8. Plaintiff asserts this solicitation concerns the operation and

Defendant notes that Omni's letter stated, "These are not just words in a proposal—this is a firm commitment—backed by integrity and a reputation of excellence in performance." [35] The paragraph containing this statement, however, relates to Omni's commitment to meeting the "goals" established by the Army Corps. The quoted statement does not qualify any purported commitment to staff an equipment mechanic at each lock and dam. Elsewhere, Omni addresses staffing by claiming that its staffing approach allows the retention of flexibility while asserting that "if a competitor proposes a lesser staffing level ... it would result in critical work not getting accomplished...." [36] Plaintiff does not, however, commit itself to a particular staffing level, or necessarily to staff equipment mechanics. Plaintiff's opinion that a lesser staffing level will potentially result in deficient work is qualified by the notation that its staffing approach permits "flexibility as additional work is assigned or less work is required." [37] This letter indicates plaintiff's commitment to a flexible staffing plan rather than rigid job assignments. Any suggestion that the Army Corps was somehow induced into awarding the contract to plaintiff by plaintiff's cover letter statement regarding competitors' staffing proposals is without merit. If the Army Corps wanted to ensure a contractor maintained a particular staffing level, it could have written the solicitations and contract in such a way, and certainly knew how to ask clarifying questions. Any citation to this letter must take into account the entirety, rather than selected portions, of the letter; thus, one must also take note of Omni's stated commitment to achieving the goals of the procurement and retention of flexibility in staffing.

Plaintiff's attempts to replace departed equipment mechanics do not evidence an understanding that it was contractually committed specifically to provide equipment mechanics. In large part, defendant cites to minutes of meetings between Omni and Army Corps officials as evidence of this alleged intent. The minutes [38] reveal that Omni attempted to fill equipment mechanic vacancies but not out of contractual obligation. Further, the minutes indicate that Army Corps representatives inquired about the status of vacancies but, in the materials provided the court, not until the January 27, 1995 minutes is there record that an Army Corps official "stated that OMNI is deficient due to the fact that OMNI is under staffed with lock and dam equipment mechanics. If [Omni is] not going to hire anyone it is in violation of the contract." [39] This meeting occurred after the November 14, 1994 letter in which the CO stated that section M.5 required full-time equipment mechanics. The court assumes that prior to the CO's November 14, 1994 letter, the Army Corps' position was more so exemplified as:

> Mr. Pittman [Army Corps representative] again inquired as to the status of the Mechanic position that is open at [L & D No. 3].... Mr. Pitman stated that the crane has not been operated in approximately 1 1/2 months and that after sixty days a crane operator will be brought out of Monroe to operate it. *If this occurs, a deficiency will exist* and the charges for the crane operator will be charged to Omni. [40]

The indication is that in December 1993, the time of this meeting, the Army Corps' position relating to this equipment mechanic vacancy is that if it leads to work not being accomplished, a deficiency would exist. There is no indication that the vacancy itself was a deficiency. During the January 5,

---

maintenance of five locks and dams, including the Overton L & D and L & D No. 3. *Id.* Perhaps it is a fair statement that this new language, which specifically incorporates the technical proposal into the contract award, indicates an understanding that section M.5, as written for the purposes of this case, just does not support the proposition forwarded by defendant.

**35.** Def.'s Ex. 2 at 3.

**36.** *Id.* at 4.

**37.** *Id.*

**38.** Def.'s Ex. 8; Pl.'s Ex. 4.

**39.** Def.'s Ex. 8 at 43; Pl.'s Ex. 4 at 43.

**40.** Def.'s Ex. 8 at 14; Pl.'s Ex. 4 at 14 (emphasis added).

1994 meeting, it is recorded that "Mr. Pittman *again* expressed his opinion about the slow process that Omni was going through in selecting a Mechanic and how ridiculous the situation appears to him."[41] Also, during the November 18, 1993 meeting, Pittman is noted as stating that "if the mechanic work is not being accomplished, then a deficiency will exist."[42] Again, what is not indicated from these statements is that the Army Corps viewed the vacancy itself as a deficiency. Rather, the deficiency would exist if work was not performed. Therefore, defendant may not rely on these meeting minutes for the proposition that plaintiff's attempts to provide an equipment mechanic evidences a contractual obligation to do so.

### D. Nature of the contract

Defendant acknowledges the contract at issue was a firm-fixed-price contract.[43] The Federal Acquisition Regulations state that such a contract

> provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties.

48 C.F.R. § 16.202–1 (1997). Given the nature of the contract, plaintiff assuredly would have been responsible for those costs exceeding its expectations or calculations. A firm-fixed-price contract places this burden upon a contractor. The fact that plaintiff discovered it could meet its contractual responsibility to provide the services required without always having an equipment mechanic on-site does not reveal an attempt to gain undue profit. Had plaintiff learned during the course of performance that each lock and dam required two equipment mechanics, plaintiff, as party to a firm-fixed-price contract, would have been entitled to no price increase as a result. That plaintiff's costs

were less than anticipated while managing to deliver the services for which the government contracted is not a justifiable reason for the withholdings that occurred in this case.

Based on the foregoing analysis, the court finds that there was no contractual requirement for plaintiff specifically to staff an equipment mechanic position at the Overton L & D and L & D No. 3.

### III. Damages

Defendant fails to assert any services, relevant to the facts of this litigation, in which there existed a deficiency in plaintiff's performance. *Arguendo,* assuming the contract required the staffing of equipment mechanics, defendant failed to prove it suffered damages as a result. Therefore, defendant's withholdings were unjustified; also, defendant is not entitled to any additional deductions, related to other purported equipment mechanic vacancies, for which defendant reserved a right to seek remittance.

### *Conclusion*

For the above stated reasons, defendant's motion for summary judgment is DENIED, and plaintiff's cross-motion for summary judgment is GRANTED. The Clerk is directed to enter judgment in favor of plaintiff in the amount of $123,163.47 plus interest from January 19, 1996, pursuant to the Contract Disputes Act, 41 U.S.C. § 611 (1994). Costs are denied at this time without prejudice pending plaintiff's application pursuant to 28 U.S.C. § 2412.

---

41. Def.'s Ex. 8 at 16; Pl.'s Ex. 4 at 16.

42. Def.'s Ex. 8 at 4; Pl.'s Ex. 4 at 4.

43. Def.'s Mot. Summ. J. at 3.