FORT MYER CONSTRUCTION
CORP., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 97–503 C.

United States Court of Federal Claims.

Jan. 22, 1999.

Paul W. Killian, Washington, D.C., with whom was James J. Briody, of counsel, for plaintiff.

Reginald T. Blades, Jr., Washington, D.C., with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, and Assistant Director Kirk T. Manhardt, for defendant.

## ORDER

MOODY R. TIDWELL, III, Senior Judge.

This government contracts case is before the court on defendant's motion for summary judgment. The parties dispute whether a contract to construct guardwalls along a certain portion of the Baltimore–Washington Parkway ("BW Parkway") required plaintiff to precast the entire guardwall units offsite or only a portion thereof. The issue is one of straight contract interpretation which defendant contends entitles it to judgment as a matter of law. This court agrees and, for the reasons set forth below, allows defendant's motion for summary judgment and dismisses plaintiff's complaint.

## BACKGROUND

### I. Summary of Facts

In June 1992, the Federal Highway Administration ("defendant") awarded Fort Myer Construction Corp. ("plaintiff") a fixed-price contract to construct and install precast concrete guardwalls along a 5.1 mile section of the BW Parkway. Each guardwall unit consisted primarily of four components: the core wall, footings, face panel, and capstone. The issue before the court is whether the contract required plaintiff to use a "total precast" method of construction (requiring plaintiff to precast all four components as an integrated unit) or "partial precast" method of construction (allowing plaintiff to construct a cast-in-place core wall and footings and precast only the face panels and capstone).

In July 1992, after winning the award, plaintiff proposed a partial precast method of construction. In August 1992, defendant informed plaintiff that its proposed method did not comply with the contract provisions because the contract required total precasting of the guardwall unit. Defendant further informed plaintiff that its proposal constituted a change to the contract and, therefore, if plaintiff wanted to use the partial precast method, plaintiff had to submit a value engineering change proposal ("VECP") for approval. Plaintiff disputed defendant's contention that its proposal constituted a change to the contract and refused to submit a VECP.

In August and September 1992, the parties exchanged a series of communications in which they disputed the meaning of the contract provisions, debated whether plaintiff's proposal complied with the contract terms, argued whether plaintiff's proposal constituted a change to the contract, and disagreed whether a VECP was necessary. Ultimately, plaintiff abandoned its proposal and built the guardwalls using a total precast method. Plaintiff never submitted a VECP. Plaintiff was fully paid based upon the total precast method of construction. Plaintiff now seeks an equitable adjustment to the contract to recover alleged costs incurred by plaintiff and its subcontractor, which plaintiff claims defendant caused by refusing to approve the partial precast method.

### II. Contract Provisions

#### A. Guardwall Specifications

The invitations for bids informed bidders that:

The bid schedule is comprised of three separate schedules of work as follows:

Schedule A: All project work excluding the guardwall

Schedule B: Stone masonry guardwall, 610 (7_) items

Schedule C: Precast concrete guardwall, 615 (1_) items

The invitation for bids also informed bidders that the work would be awarded in combination—as *either* Schedules A + B *or* Schedules A + C. Plaintiff was awarded the Schedule A + C combination to construct precast concrete guardwalls of three types, known as Types I, II, and IV. The award required performance "in strict accordance with the Contract Clauses and below listed specifications, schedules, drawings, and conditions,"

which included, *inter alia,* certain provisions of the special contract requirements ("SCR") and certain plan sheets. The award and bid schedules labeled Types I, II, and IV guardwalls as "PRECAST CONCRETE GUARD-WALL, TYPE [I, II, and IV, respectively]" and specified that construction of each guardwall type was governed by the 615 item numbers. The 615 item numbers refer to section 615 of the SCR and corresponding plan sheets 206–08.

Section 615 of the SCR is titled "PRE-CAST CONCRETE GUARDWALL" and describes the materials and construction requirements for precast guardwall construction. Subsection 615.01 states:

> This work shall consist of the furnishing, fabrication, and installation of precast concrete guardwall which is an alternative to the stone masonry guardwall. The guardwall shall match in every respect profiles, colors and textures of the guardwalls constructed and in place on the Baltimore–Washington Parkway. . . .

Subsection 615.02 states that "[p]recast concrete units shall conform to subsection 712.07," which in turn states that "[t]hese units shall be cast in substantial permanent steel forms."

Subsections 615.01 and 615.03 grant discretion to the Engineer to accept or reject precast segments that fail to conform, in any way, to contract specifications, and plaintiff agreed to bear the cost of such non-conformity:

> The Contractor shall demonstrate the ability to match the Engineer's sample by submitting a full scale guardwall sample (10 foot typical segment) of his own to the Engineer for approval, prior to fabrication of any guardwall. If in the opinion of the Engineer, the Contractor's guardwall sample fails to match the engineer's sample, and/or fails to be in accordance with these specifications, the materials and procedures shall be changed or altered by the Contractor and an additional sample, or samples, submitted until approval is obtained from the Engineer.

.    .    .    .    .

> The Engineer shall be the sole judge as to the acceptability of the appearance of the segments. Any portion of the segments found to be unsatisfactory shall be repaired or replaced, as directed and approved by the Engineer, and at no expense to the Government.

.    .    .    .    .

> Acceptance of precast segments by the Engineer shall be determined on the basis of material tests . . . and . . . visual inspection.

Plan sheets 206–08 depict the precast concrete guardwall. Plan sheet 208 is titled "PRECAST CONCRETE GUARDWALL STONE AND COLOR PATTERNS." Plan sheets 206 and 207 are titled "PRECAST CONCRETE GUARDWALL, TYPE 1–27″ HEIGHT." Plan sheets 206 and 207 illustrate the design specifications (e.g. 10–foot segments, tongue-and-groove connectors, ship-lapped ends, and full-depth joints) and depict the precast concrete guardwall as a fully integrated unit.

Note 2 on plan sheet 207 refers the reader to stone masonry guardwall plan sheets for the limited purpose of obtaining "[r]einforcing details and dimensions for Type IV guardwall" only.

## B. VECP Provision and Changes Clause

Contract clause 52.248–3 sets forth the requirements and procedures for submitting a VECP. A VECP is defined in 52.248–3(b) as "a proposal that—(1) Requires a change to this, the instant contract, to implement; and (2) Results in reducing the contract price or estimated cost without impairing essential functions or characteristics. . . ." Moreover, 52.248–3(e)(3) states:

> Until a notice to proceed is issued or a contract modification applies a VECP to this contract, the Contractor shall perform in accordance with the existing contract. The Contracting Officer's decision to accept or reject all or part of any VECP shall be final and not subject to the Disputes clause or otherwise subject to litiga-

tion under the Contract Disputes Act of 1978 (41 U.S.C. §§ 601–613).[1]

The Changes Clause of the contract is located at 52.243–4 and states, in pertinent part:

(a) The Contracting Officer may, at any time, . . . by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes—

(1) In the specifications (including drawings and designs);

(2) In the method or manner of performance of the work;

.    .    .    .    .

(c) Except at provided in this clause, no order, statement, or conduct of the Contracting Officer shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment.

.    .    .    .    .

(f) No proposal by the Contractor for an equitable adjustment shall be allowed if asserted after final payment under this contract.

### C. Subcontract

Plaintiff subcontracted to have Highlights Corp. and Superior Precast, Inc. (collectively "subcontractor") fabricate the precast units. The subcontract, executed on June 25, 1992, incorporates by reference earlier agreements dated April 28, 1992; May 11, 1992; and May 18, 1992. All of the agreements that comprise the subcontract identify Types I, II, and IV guardwalls as "Precast Concrete Guardwall, Type [I, II, and IV]" and list 615 item numbers in reference thereto.

The May 11, 1992, agreement contains key language indicating the parties' understanding of the precast method:

It is agreed and understood by Highlights Corporation and Superior Precast, Inc. that they will submit for approval, a cast-in-place concrete core wall and precast facing element for the owner's approval one time only. Should the owner have any reservations or reject this method, or ask

for additional material which requires additional time to be spent on providing back-ups, or for any reason whatsoever which is not in the best interest of the project and/or Fort Myer Construction Corporation, this subcontractor and its supplier at sole discretion of Fort Myer Construction Corporation will produce full precast units (same as those previously used and installed on recent projects) and with no change in price.

The May 11, 1992, agreement also distinguishes between a "panel" method and a "full-precast" method when it incorporates by reference a list of questions presented to bidders:

To All Bidders: please answer the following questions . . .:

3. Lead time needed to provide two (2) samples (one full precast unit, one panel section). . . .

5. If panel method to be submitted for approval, what is the length of each panel?

The June 25, 1992, agreement states:

In the event that the Subcontractor is unable to secure the Owner's approval for the methods and material that the Subcontractor proposes, . . . the Subcontractor will [not have any] recourse against the Contractor nor will he be entitled to any compensation by the Owner or the General Contractor.

Plaintiff was awarded the BW Parkway project on June 10, 1992.

### III. Summary Judgment Arguments

Defendant seeks summary judgment on two grounds: (1) the contract required total and not partial precasting and, thus, defendant acted properly when it characterized plaintiff's proposal as a change to the contract and insisted plaintiff file a VECP; and (2) plaintiff incurred no recoverable harm because (i) any delay or injury was caused by plaintiff's wrongful failure to submit a VECP and not by any wrongful act of defendant, (ii) the Severin Doctrine precludes plaintiff from

---

**1.** Plaintiff never submitted a VECP. Had plaintiff done so, defendant's rejection of plaintiff's pro- posal would necessarily preclude plaintiff from filing suit in this court.

recovering the subcontractor's damages, and (iii) the terms of the subcontract obligate the subcontractor to provide total precasting at no extra charge to plaintiff, thus illustrating that plaintiff suffered no economic harm at all.

Plaintiff advances three arguments in opposition to defendant's motion: (1) nothing in the contract documents specifically precludes the use of partial precasting, so the court must find that partial precasting is permissible; (2) a genuine issue of material fact exists as to contract interpretation because the contract is ambiguous and can reasonably be interpreted as allowing partial precasting; and (3) defendant's failure to grant plaintiff's proposal constituted a constructive change to the contract, thus invoking the Changes Clause and rendering the Severin Doctrine inapplicable to this case.

The court addresses each argument, in turn, below.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of establishing the absence of any disputes of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party has met its burden of showing entitlement to judgment as a matter of law, the burden then shifts to the non-moving party to provide facts establishing that a genuine issue for trial exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party cannot discharge its burden by cryptic, conclusory, or generalized responses but, instead, must produce some evidence showing a dispute of material fact. *See Tunnell v. Wiley*, 514 F.2d 971, 976 (3d Cir.1975); *see also Willetts v. Ford Motor Co.*, 583 F.2d 852, 856 (6th Cir.1978). A material fact is one that would

change the outcome of the litigation. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Facts which are not outcome determinative are not material; disputes over such facts will not preclude the court from granting summary judgment. *See id.*

### II. Contract Interpretation

"Contract interpretation is a matter of law that may be resolved through summary judgment." *Northrop Grumman Corp. v. United States*, 41 Fed.Cl. 645, 651 (1998); *see Omni Corp. v. United States*, 41 Fed.Cl. 585, 590 (1998).

In construing the contract provisions, the court shall read the contract as a whole and interpret the provisions in such a manner as to "effectuate [the contract's] spirit and purpose." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991); *see Northrop Grumman Corp.*, 41 Fed.Cl. at 651; *see also Gaston & Assoc., Inc. v. United States*, 27 Fed.Cl. 243, 249 n. 7 (1992) (court cannot consider contract clauses in isolation). The court should give each provision a meaning that achieves a harmonious and reasonable result and avoid interpretations that are conflicting, inexplicable, meaningless, or weird. *See Gould, Inc.*, 935 F.2d at 1274; *Northrop Grumman Corp.*, 41 Fed.Cl. at 651; *Omni Corp.*, 41 Fed.Cl. at 591.

Ordinarily, the court's interpretation begins with the plain and unambiguous language of the contract provisions. *See Omni Corp.*, 41 Fed.Cl. at 590. Problems arise, however, when contract provisions are ambiguous. A provision is not ambiguous simply because the parties dispute its meaning. *See Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1578–79 (Fed.Cir.1993); *Cherry Hill Sand & Gravel Co. v. United States*, 8 Cl.Ct. 757, 764 (1985). The court should not strain to create an ambiguity where none exists. *See Dana Corp. v. United States*, 200 Ct.Cl. 200, 470 F.2d 1032, 1043 (Ct.Cl.1972).

If an ambiguity exists, the court must determine whether it is patent or latent. An ambiguity is latent when the contract is susceptible to more than one reasonable interpretation, each of which is

consistent with the contract language. *See Community Heating & Plumbing Co.*, 987 F.2d at 1579. In such a case, the ambiguity is resolved in favor of the non-drafting party so long as his interpretation is reasonable. *See id.* at 1579 n. 6; *Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed. Cir.1992). On the other hand, "an ambiguity is patent when there is an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap." *H.B. Zachry Co. v. United States*, 28 Fed.Cl. 77, 81 (1993). "The existence of a patent ambiguity in a contract requires the contractor to inquire of the contracting officer as to the true meaning of the contract before submitting a bid." *Id.; see Community Heating & Plumbing Co.*, 987 F.2d at 1579. "This duty of inquiry arises regardless of the reasonableness of the contractor's interpretation of the contract." *H.B. Zachry Co.*, 28 Fed.Cl. at 81.

Having set forth the applicable law, the court now turns to the contract documents and determines what those documents require.

### A. Which provisions of the SCR and plan sheets control?

Plaintiff, at times, refers to section 610 of the SCR and plan sheets 201–05 to show that the partial precast method falls within the contract requirements. Defendant contends that section 610 and plan sheets 201–05 pertain only to stone masonry and not precast construction. The stone masonry provisions and plan sheets are wholly inapplicable to the facts of this case, except to show "[r]einforcing details and dimensions of Type IV guardwalls."[2] Plaintiff was to obtain all other details for Types I, II, and IV precast guardwall construction from the section 615 provisions and plan sheets 206–08. This court agrees with defendant and finds that plaintiff's reliance on section 610 of the SCR and plan sheets 201–05 is misguided.

Plaintiff was awarded the Schedule A + C combination. The A + C combination was defined as "precast concrete guardwall, 615(1_) items." The term "615[ ] items" refers to section 615 of the SCR and includes corresponding plan sheets 206–08. This connection is evident because both section 615 of the SCR and plan sheets 206–08 are labeled "PRECAST CONCRETE GUARDWALL."

The Schedule B provisions do not apply because plaintiff was not awarded the Schedule A + B combination. The A + B combination was defined as "stone masonry guardwall, 610(7_) items." The term "610[ ] items" refers to section 610 of the SCR and plan sheets 201–05.[3] Except to the limited extent that the 610 items are expressly incorporated by reference into the 615 items,[4] the 615 items are wholly distinct from the 610 items. Consequently, the 610 items are not part of plaintiff's contract.

Plaintiff contends that the contract is ambiguous, at least with respect to Types II and IV guardwall construction, because there are no Type II and IV plan sheets. Plan sheets 206–07 are specifically labeled as Type I and not Types II and IV. Plaintiff contends that, regarding Types II and IV, filling in the blanks with stone masonry provisions and plan sheets provides a reasonable interpretation of ambiguous contract terms. Plaintiff then argues that the court must resolve latent ambiguities in favor of the non-drafting party. Plaintiff is wrong.

The fact that plan sheets 206–07 are labeled only as Type I does not mean that plaintiff was "off the hook" and not required to totally precast Types II and IV. The specifications, or 615 provisions of the SCR, clearly mandate total precast construction. The specifications are not obsolete simply because of the absence of Type II and IV labels on the plan sheets.

Moreover, plaintiff's interpretation of the contract, as a matter of logic and a matter of law, is unreasonable. All of the contract

---

2. Plan sheet 207 n. 2.

3. This connection, likewise, is evident because both section 610 of the SCR and plan sheets 201–05 are labeled "STONE MASONRY GUARDWALL."

4. The only express incorporation of 610 items occurs at note 2 on plan sheet 207, defined *supra.*

documents—including the solicitation, award, bid schedules, and subcontract—clearly and unambiguously label Types I, II, *and* IV guardwalls as precast concrete, not stone masonry. These documents also point the reader to the precast provisions of the SCR for guidance, not the stone masonry provisions. It necessarily follows that only precast plan sheets, not stone masonry plan sheets, apply. This is the only interpretation that achieves harmony. Plaintiff's interpretation, by contrast, leads to contradicting contract requirements; it creates discord between the precast provisions of the SCR and the stone masonry plan sheets. Because plaintiff's interpretation is unreasonable, its latent ambiguity argument necessarily fails.

■■ In addition, the ambiguity, if it exists, is patent and not latent. The lack of Types II and IV plan sheets is glaringly obvious. "By definition, an 'obvious void' or glaring omission[, like the one plaintiff alleges here,] can never be a latent ambiguity." *Interwest Construction v. Brown,* 29 F.3d 611, 616 (Fed.Cir.1994). Plaintiff was under a duty to inquire further before submitting its bid. *See id.* at 615 (duty of inquiry applies to patent ambiguities). Plaintiff failed, however, to make any inquiries whatsoever during the bidding process. Plaintiff may argue that it did not, at that time, recognize the ambiguity, but lack of knowledge does not excuse plaintiff from its duty to seek clarification. *See Community Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1579–80 (Fed.Cir.1993); *see also J.A. Jones Construction Co. v. United States,* 184 Ct.Cl. 1, 395 F.2d 783, 790 (Ct.Cl.1968). Consequently, plaintiff is bound by defendant's interpretation of the contract and is precluded from relief.

## B. What did the contract require?

Upon review of the solicitation, award, bid schedules, specifications, plan sheets, and other applicable contract provisions, it is clear that the contract required plaintiff to construct Types I, II, and IV guardwalls using the total precast and not the partial

precast method of construction. Moreover, the parties understood at the time they entered into the agreement that this was what the contract strictly required. Finally, plaintiff's proposed partial precast method constituted a change to the contract that should have been submitted as a VECP. The court reaches its conclusions for the following reasons.

### 1. The spirit and purpose of the contract.

#### a. The contract required total precasting of Types I, II, and IV guardwalls.

The spirit and purpose of the contract required plaintiff to construct Types I, II, and IV guardwalls using a total precast method of construction. Section 615 of the SCR, plan sheets 206–08, bid schedules, award, and related contract documents consistently suggest or depict totally precast units. The word "precast" is always linked to "guardwall" and "unit" and never to only the "face panel." A cast-in-place structure is not described or depicted in any of the precast SCR or plan sheets. The lifting method, described in subsection 615.03 of the SCR, recommends lifting points for a fully integrated unit, not one that is partially precast. The measuring method for purpose of calculating pay items, described in subsection 615.04 of the SCR, refers to only precast concrete, not cast-in-place concrete. Plan sheets 206–08 and section 615 of the SCR describe and depict a guardwall segment that is totally precast as an integrated unit that includes the face panels, core wall, footing, and cap stone; these documents do not depict a cast-in-place structure. All past projects, with one limited exception,[5] were performed using the total precast method, suggesting that total precasting was necessary to "match in every respect" the surrounding guardwalls, as was required by subsection 615.01 of the SCR. Nothing in section 615 of the SCR, plan sheets 206–08, bid schedules, award, or related contract documents suggests or depicts that plaintiff

---

5. The facts and circumstances of the one exception are distinct from those of this case and are,

thus, irrelevant to the court's analysis.

could construct the guardwalls using a partial precast method. Therefore, the court concludes that the contract documents required plaintiff to construct the Type I, II, and IV guardwalls using the total precast method of construction.

### b. The contract required strict compliance, not an equal alternative.

Plaintiff contends that its partial precast method blended the best characteristics of both the precast and stone masonry methods and, therefore, should have been allowed as a comparable method or equal alternative. Defendant, however, need not accept variations to the contract, regardless of the benefits such variations may offer, because the contract required strict compliance.

The contract called for construction of Types I, II, and IV precast concrete guardwalls *"in strict accordance with* the Contract Clauses and the below listed specifications, schedules, drawings, and conditions...." (Solicitation, Offer, and Award ¶ 10) (emphasis added). Here, the government contracted to receive precast guardwalls that were fabricated as totally, not partially, precast units. It is irrelevant whether plaintiff's partial precast method was comparable, equal, or even better than either the precast or stone masonry construction methods. *See Maxwell Dynamometer Co. v. United States,* 181 Ct.Cl. 607, 628, 386 F.2d 855 (1967) (government is entitled to strict compliance without regard to whether contractor believes this is prudent or desirable); *H.L.C. & Assoc. Construction Co. v. United States,* 176 Ct.Cl. 285, 306, 367 F.2d 586 (1966) (contractor cannot substitute his judgment for that of government, regardless of reason, when strict compliance is required). Instead, the court must focus solely on whether plaintiff strictly complied with the total precast requirements of the executed contract.

There are at least eleven distinctions between the contract and plaintiff's proposal:

1. The contract required a precast core and footing; plaintiff proposed a cast-in-place core and footing.

2. The contract required a casting length of 10–feet for the Type I guardwall segment; plaintiff proposed full length walls with vertical expansion joints every 90–feet.

3. The contract required a casting length of 10–feet for the Type IV guardwall segments; plaintiff proposed full length core walls with vertical contraction joints every 50–feet and vertical expansion joints every 100–feet.

4. The contract required tongue and groove connectors; plaintiff's proposal did not include any tongue and groove connectors.

5. The contract required each 10–foot segment to have ship-lapped ends with ¾–inch full depth joints between segments; plaintiff did not propose ship-lapped ends or full depth joints but proposed a 3/4–inch joint between the 4–inch deep face panels only and a keyway to be constructed vertically in the 3/4–inch joint. No keyway was specified in the contract.

6. The contract did not provide for a construction joint and keyway between the footing and the core wall for the Type IV guardwalls; plaintiff proposed a construction joint and keyway between the footing and the core wall in Type IV guardwalls,

7. The contract did not provide for a construction joint or keyway at the top of the curb elevation; plaintiff proposed a construction joint and keyway at the top of the curb elevation present in Type II and Type IV guardwalls.

8. The contract required four lifting devices inserted into the top of the mowing strip to lift the entire precast guardwall segment; plaintiff proposed 2 Burke 1–ton Rapid Lift Inserts per face panel.

9. The contract required a "Z" bar reinforcing steel connection between the cap stone and core; plaintiff proposed a straight bar reinforcing steel connection between the cap stone and core.

10. Plaintiff proposed walers in a joint in the face panels and ½–inch coil ties extending full depth; there were none specified by the contract.

11. The contract required the "Z" bar connectors between face panels and core to have the same orientation for front and back bars; plaintiff proposed the "Z" bar connectors between face panels and core to have mirror image orientation for front and back bars.

Plaintiff concedes [6] that these differences exist, as is clear from the numerous admissions in both plaintiff's brief and affidavits attached thereto. For example, plaintiff characterizes the differences as "suggested changes from specific requirements shown in the Contract drawings" and further states that such changes "are suggestive only, and are subject to the Owner's consideration." (Pl. Resp. at 21; Pl.App. at 19.) Plaintiff's affiants acknowledge that the distinctions constitute "deviations" from the contract, (Rex Aff. ¶ 9; Straw Aff. ¶ 8; O'Connell Aff. ¶ 25.), but argue that the deviations are insignificant or could have been eliminated and that plaintiff's proposal provided better benefits than the existing contract.[7]

Regardless of what plaintiff could have or would have done, however, the fact remains that plaintiff's proposal was different from, and therefore did not strictly comply with, the existing contract. Because defendant was entitled to strict compliance, defendant was not obligated to accept variations in procedures or methods and, therefore, was not obligated to accept plaintiff's proposal as a comparable method. Thus, defendant properly insisted that plaintiff strictly adhere to the contract and properly insisted that plaintiff submit its proposal as a VECP.[8]

Plaintiff contends that it *did* strictly comply with the contract because the partial precast method matches colors and textures of the surrounding guardwalls. That, plaintiff argues, is all that subsection 615.01 of the SCR requires.[9] Plaintiff, however, is incorrect. The spirit and purpose of the contract is to "match in every respect" the surrounding guardwalls, which requires matching "profiles" as well as "colors and textures." 615.01 SCR. The court cannot, as plaintiff suggests, narrowly interpret subsection 615.01 because, to do so, isolates only a few key words and requires the court to ignore the overwhelming number of provisions that suggest or require the guardwalls to perfectly match the surrounding guardwalls in all respects, not just surface area or face panels. An isolated and narrow construction of contract terms improperly leads to conflicting interpretations of the contract provisions and achieves an unharmonious and unreasonable result. For these reasons, the court rejects plaintiff's argument and reiterates that the contract strictly required total precasting of Types I, II, and IV guardwalls.

Plaintiff also contends that since the contract did not expressly preclude the partial precast method, plaintiff should have been allowed to use it without submitting a VECP. The court disagrees. The parties contracted to use the total precast method of construction. It was never agreed, understood, or contemplated that plaintiff could use any method that was not expressly prohibited by the contract. This court will not re-write the contract; to do so runs contrary to its spirit and purpose.

---

**6.** To the extent plaintiff *attempts* to dispute distinctions, plaintiff does so solely by relying on the stone masonry documents. As this court has held, such reliance is misguided.

**7.** For example, plaintiff states that it "verbally offered to put joints every 10–feet." It argues that tongue and groove joints "could easily have been incorporated," that additional or longer lifters "could easily have been added," and that the z-bars "could easily have been flipped." Plaintiff contends that the "walers were no cost added value which resulted in less cracked units," and that the walers "could easily have [been] removed." Plaintiff asserts that some of the deviations "could have been addressed through the shop drawing process." Finally,

plaintiff concludes that "Fort Myers's detail is better from an engineering perspective." (Pl. Resp. at 21–26; Rex Aff. ¶¶ 5–9, 11–12; Straw Aff. ¶¶ 5–8; O'Connell Aff. ¶¶ 17–18, 21, 23–25.)

**8.** Because defendant did not require plaintiff to do anything more than what the contract strictly required, defendant's insistence on total precast construction did not constitute a constructive change to the contract. Accordingly, plaintiff is not entitled to relief under the Changes Clause.

**9.** Section 615.01 of the SCR states, "The guardwall shall match in every respect profiles, colors and textures of the guardwalls constructed and in place on the Baltimore–Washington Parkway."

## 2. The parties' understanding of the contract.

■ "[T]he parties' contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight...." *Omni Corp. v. United States*, 41 Fed.Cl. 585, 591 (1998). "[H]ow the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself." *Macke Co. v. United States*, 199 Ct.Cl. 552, 467 F.2d 1323, 1325 (Ct.Cl.1972). In the instant case, plaintiff's understanding during the bidding process and at the time of contracting is key to whether it is entitled to relief. The most compelling indicator of plaintiff's understanding during this critical time comes from the plain language of the subcontract, because the terms were discussed and agreed upon during the bidding process and prior to issuance of the award.[10]

The subcontract (like the solicitation, award, and bid schedules) labels all three types of guardwalls (I, II, and IV) as precast concrete and refers to 615 item numbers. The subcontract distinguishes between a "panel" method and a "full-precast" method. The subcontract includes a provision requiring plaintiff to submit its partial precast method for approval. The subcontract also requires guardwalls to be totally precast, the "same as those previously used and installed on recent projects," if approval is denied. The plain language of the subcontract makes clear that plaintiff understood that its partial precast, or panel, method deviated from the contract and that the contract required total precasting of Types I, II, and IV guardwalls. Plaintiff cannot now claim otherwise, as such an argument seems contrived.

Plaintiff, however, points to several expert opinions to show that the contract could reasonably be interpreted, or understood, as allowing partial precasting. The opinions, plaintiff argues, demonstrate two things: (1) the contract was ambiguous[11] because reasonable minds differ as to its interpretation; and (2) the opinions create a genuine issue of fact over contract interpretation. The court disagrees.

■ Differing interpretations of the contract do not necessarily create an ambiguity or preclude summary judgment. *See Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed.Cir.1993) (question of ambiguity may be resolved as matter of law); *Omni Corp.*, 41 Fed.Cl. at 590 (contract interpretation can be resolved as matter of law); *Cherry Hill Sand & Gravel Co. v. United States*, 8 Cl.Ct. 757, 764 (1985) ("contract terms are not rendered ambiguous merely because parties disagree as to their meaning"). The parties' understanding of the contract before the advent of a dispute is much more persuasive than the later-developed legal arguments. *See Omni Corp.*, 41 Fed.Cl. at 591. Here, it is clear that the parties understood, at the time of contracting and before the dispute arose, that the total precast method was required. It is also clear that plaintiff understood that the partial precast method deviated from the contract. Plaintiff's post-dispute collection of expert opinions does not alter the parties' original understanding of the contract terms.

In addition, plaintiff's experts, although they present conflicting interpretations of the contract, do not dispute the underlying facts of this case. Therefore, the expert opinions do not create a genuine issue of fact to preclude the entry of summary judgment.

## CONCLUSION

For the foregoing reasons, the court finds that the contract required, and the parties clearly understood, that plaintiff was to construct precast guardwalls of Types I, II, and IV using the total precast method. In addition, plaintiff understood that its proposed partial precast method deviated from the contract requirements. As a deviation, plaintiff was required to seek approval through the VECP process. Defendant's refusal to grant approval absent a VECP was wholly appropriate. Accordingly, this court *AL-*

---

**10.** The subcontract consists of several agreements dated April 28, 1992; May 11, 1992; May 18, 1992; and June 25, 1992.

**11.** The court has already addressed, in part, plaintiff's ambiguity argument *supra*.

**730**

*LOWS* defendant's motion for summary judgment and *DISMISSES* plaintiff's complaint. The remaining issues raised in the parties' briefs are moot.

**IT IS SO ORDERED.**